[Crim. No. 5273. Second Dist., Div. One. May 16, 1955.]

THE PEOPLE, Respondent, v. MANUEL MATA et al., Appellants.

Barry Sullivan, Hornwood & Seltzer, Lewis Notrica and Eleanor V. Jackson for Appellants.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

DORAN, J.—By indictment the appellants were accused of murdering one William D. Cluff on December 6, 1953. Motions to set aside the indictment, and for change of venue, were denied, and on trial before a jury, the appellants were each found guilty of manslaughter. Motions for new trial and applications for probation were denied as to each defendant.

Viewed in the light most favorable to the People, it appears that a United States Marine, Private John W. Moore, while waiting at the corner of Seventh and Broadway in Los Angeles for the street light to change, the hour being about 6:20 p. m., was shoved off the curb and struck behind the left ear by some unknown party. Turning around, Private Moore saw the defendants Marquez and Venegas, who "asked me if I had any beef." Moore then backed out into and across Seventh Street, appellants Venegas and Marquez in pursuit—"I was kicked at and swung at, and I was defending myself." On the way across the street, Private Moore grabbed a "No Left Turn" sign, "but it slipped out of my hand and fell on its side and tripped up these two fellows that were coming towards me." Moore also saw the third defendant Mata but "didn't see him do anything, but I felt it," apparently assuming that Mata was responsible for the blow behind the ear, but didn't see Mata again until Mata was fighting with another man across the street. Other than the initial shove and blow, appellants made no further contact with Private Moore, and no serious injury resulted.

While Private Moore was backing up to building with Venegas and Marquez "coming towards me again, . . . kicking, swinging with their fists," Mr. Cluff, the decedent, age 56 years, first entered the fray;—"He came up, grabbed one of them by the seat of the pants and coat collar and grabbed him away;" saying, "Leave him alone." Moore did not know which of the two men Cluff grabbed, but the man turned and struck at Cluff who slumped to the sidewalk; Moore saw blood on Cluff's face. The record indicates that a large crowd had gathered, that there was much confusion, and considerable diversity of opinion as to the identity of the individual defendants and what each was doing at the time in question.

An autopsy was performed by the coroner's chief autopsy surgeon Newbarr and a neuropathologist, Dr. Courville. The cause of Mr. Cluff's death was given as "massive subarachnoid hemorrhage, precipitated by sudden elevation of blood pressure incident to altercation. Under other conditions: Advanced atherosclerosis of the cerebral blood vessels." There was no fracture of the skull. The deceased's heart was enlarged and the left coronary artery was occluded 90 per cent. Dr. Newbarr testified that the traumatic injuries found "were relatively minor," that "The abrasions in the forehead are small . . . and really form no pattern whatsoever"; the

abrasions were not contributing causes to Mr. Cluff's death, "strictly from the standpoint of the trauma."

Considering the decedent's previous condition and the altercation, "the exertion, the excitement, the anxiety and the fear might cause, probably would cause a rise in blood pressure and would cause diseased vessels to rupture." Decedent suffered from a severe pathological condition with hypertensive heart disease, and might have a spontaneous brain hemorrhage at any time, from any exertion "running for a street car, a fit of temper." Dr. Newbarr further stated that "whether he was struck, or whether he fell, in my opinion is only incidental because the severity of the trauma is not great enough to have any direct bearing on the rupture of the blood vessel." Similar testimony was given by Dr. Courville to the effect that "emotional excitement, physical stress could very well be responsible and in this case perhaps both."

Appellants complain that the trial court erroneously gave five CALJIC instructions to the jury on the law of conspiracy although "There was no evidence whatsover of conspiracy on the part of the defendants," or that if such instructions were to be given, "the jury should not have been erroneously instructed concerning the inflicting of a mortal blow where there was no such evidence of any such mortal blow." Also that the jury should have been "exposed" to the language of CALJIC 937a and "told that the mere presence and association of the defendants is insufficient to show a conspiracy."

It is a fundamental rule that instructions should be read as an entirety, and that the effect of specific portions which standing alone might be deemed objectionable to a defendant, may be cured and rendered harmless by other statements therein. But this is a rule which, obviously, must work both ways. Therefore, if the instructions, taken as a whole, strongly present the theory of the prosecution and minimize that of the defense, or ignore points on which the particular case seems to turn, a jury may and probably will draw the inevitable conclusion that the trial judge is, in effect, suggesting conviction rather than acquittal. In this, and all other particulars, the so-called CALJIC stereotyped instructions are no more sacrosanct than any others.

Unless a particular instruction fits the evidentiary situation and presents a fair and impartial picture of the issues, it should not be given.

This appears to be the situation in the instant case. In view of the evidence as to what occurred when Mr. Cluff died,

the somewhat conflicting stories of the eyewitnesses, and the opinions of the autopsy surgeons that death resulted from Mr. Cluff's previous heart and arterial condition rather than from any "mortal blow," all the more care was required to make certain that the jury did not convict these defendants on general principles.

As respondent states, conspiracy may be implied from the surrounding circumstances. Mere association, however, is not enough, and as appellants argue, this should have been made plain to the jury by the giving of CALJIC 937a along with the five extended instructions on conspiracy, if the latter were to be given. The record discloses that the three defendants had been drinking; that one of them, Marquez, stated, "he was looking for a fight, didn't give a damn who it was with"; that two or perhaps three defendants perpetrated an assault on Private Moore; that the decedent took hold of one of the defendants, who then struck at Cluff, whereupon Cluff had a heart attack and died from the excitement. According to Private Moore, one of the defendants, Mata, was then fighting with another man who had Mata down at the time Mr. Cluff died. If this account is true, then Mata could not have been directly connected with the Cluff incident.

The prosecution did not, and obviously could not, contend that the defendants had any preconceived plan to attack Mr. Cluff. It is argued, however, that "the jury could reasonably conclude that the three appellants were associated and acted together, bent on engaging in disorderly conduct and with committing assault upon anyone who sought to restrain them." As before mentioned, the evidence is confusing as to which two defendants were involved in the Cluff episode, as to which defendant struck Private Moore, and as to what each defendant was doing at any given time. While it is proper for a jury to draw reasonable inferences from the evidence, matters such as those mentioned must not be determined by conjecture, guesswork or wishful thinking.

The point of all this is that in this confused state of the evidence the trial judge saw fit to give the five detailed instructions on conspiracy, and refused to give the CALJIC instruction telling the jury that "mere presence and association of the defendants is insufficient to show a conspiracy." Without this explanatory instruction a jury might well assume that a conspiracy actually existed between the three defendants, and might take it for granted that a "mortal blow"

had been struck by one defendant, for which the others would thereby automatically become responsible. To present the jury with these assumptions, considering the state of the evidence herein, can be deemed nothing less than prejudicial error.

Other parts of the instructions appear to add to rather than cure the defects noted. For example, the giving of such instructions as CALJIC 601 and 603, relating to assault ''by means of force likely to produce great bodily injury,'' was ill fitted to the peculiar facts of this case, and only added further material to the over-all picture of three conspirators, one of whom is assumed to have struck a mortal blow. Instructions, CALJIC or otherwise, must have correct relation to the facts of the case being tried.

In this connection it is to be noted that the jury was given no concrete instruction presenting the appellants' theory of the case, and no instruction adequately keyed to the evidence. Four instructions attempting to do this, requested by the defendant Mata, were refused. One of these (clerk's transcript, p. 71) reads: ''You are instructed that even if you should find that through excitement, thus induced in the nervous system of a bystander, a hemorrhage was caused in the brain of the bystander; and even if you should find that his death was a natural and probable consequence of such disturbance of the peace in the presence of the deceased; nevertheless, you may not find, on such evidence alone, that the defendants or any of them were guilty of any kind of homicide.'' In refusing this instruction the trial judge made the notation: ''Proximate cause covered by instructions given —the requested instruction is confusing and inept.'' If not properly phrased, the trial court had the power to modify. It is true that the usual abstract instructions on proximate cause were duly given, but the defendants' theory which was supported by the autopsy surgeons' testimony, was in no adequate manner presented for the jury's consideration. Appellants also direct attention to the argument of the deputy district attorney in stating to the jury that ''the delay in this case was caused because Miss Jackson (defendants' attorney) tried every trick that she knew of and every trick available to her to keep that case from going to trial.'' When the defense objected to the use of the word ''trick,'' the trial court then informed the jury concerning Miss Jackson's petition for a writ of prohibition in the District Court of Appeal for the purpose of determining whether the grand

jury had enough evidence to return an indictment, and the denial of such petition. Although the trial judge informed the jury,. ''Now, that has nothing to do with the question of guilt or innocence, but the question as to whether the grand jury acted legally,'' nevertheless, such a recital informing the jury as to the defendants' previous unsuccessful efforts to obtain release, was uncalled for, and could be taken as indicating that there was sufficient evidence to warrant a conviction, and that the appellate court so believed. In connection with the instructions given and refused, hereinbefore mentioned, such conduct could well be prejudicial.

Regardless of the disorderly conduct of the defendants, and the unfortunate death of Mr. Cluff resulting from intervention as hereinbefore related, each defendant was entitled to a fair and impartial trial. The fundamental rights of the accused parties demanded an unbiased presentation to the jury of the issues involved, which included the important questions of whether any conspiracy existed, and whether any one or more of the defendants should be found guilty either by reason of conspiracy or for any other reason.

The peculiar facts of the instant case coupled with the state of the evidence as disclosed by the record, make it all the more necessary to safeguard every constitutional right of the accused.

For the reasons hereinbefore indicated, the judgment and order denying a new trial are reversed and a new trial ordered.

White, P. J., and Drapeau, J., concurred.