[Crim. No. 5413.   Second Dist., Div. One.   Dec. 20, 1955.]

THE PEOPLE, Respondent, v. ROMEO R. TERRELL, Appellant.

Robert H. Green for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, the above-named defendants were charged in two counts with the crime of abortion (Pen. Code, § 274). Count I alleged that the offense was committed on or about June 18, 1954, and in Count II the offense was alleged to have been committed on or about June 20, 1954. Each count alleged that the defendants provided, supplied, used and employed an instrument and other means upon Maria Larriva with the felonious intent to procure a miscarriage, the use and employment of the instrument and other means not being necessary to preserve her life.

To both counts of the information defendants pleaded not guilty. Defendant Terrell's motion for a separate trial was denied. A trial before a jury resulted in verdicts finding defendants guilty on both counts. Motions for a new trial were denied. Proceedings were suspended and defendant Terrell was granted conditional probation. From the judgment (Pen. Code, § 1237) and from the order denying his motion for a new trial, defendant Terrell prosecutes this appeal.

While, following a guilty verdict, we are only required to view the evidence in the light most favorable to the prosecution (*People* v. *Silva,* 119 Cal.App.2d 421, 422 [259 P.2d 74]), in view of the grounds urged for a reversal, we are disposed to present a comprehensive review of the evidence in its entirety. The record reflects that defendant Terrell (hereinafter referred to as appellant) is a licensed chiropractor and maintained an office at 6027 South Broadway, in the city of Los Angeles. Defendant Arterbury was employed at the Douglas Aircraft Company in El Segundo, and was studying to be a chiropractor. Roberto Larriva, husband of the complaining witness, was also employed at the Douglas Aircraft Company.

Mrs. Maria Larriva found herself in what she believed to be a pregnant condition in June, 1954. She had low blood pressure and would feel very weak, dizzy and short of breath. She decided during June to terminate the pregnancy. She discussed with her husband the possibility of terminating the pregnancy, expressing the thought that she could not have any family because of the condition of her health. She decided to have an abortion. On Saturday night, June 12, she went with her husband to an office at 6027 South Broadway, Los Angeles. Appellant asked, ''Are you the couple who was coming here for me to take car__ of you?'' Mrs. Larriva first saw appellant in a waiting room. He then took her into another room

which contained medical tables and instruments. Appellant examined her and took her blood pressure. He said that it was very low, that she was very weak. Mrs. Larriva did not see appellant do any writing. He gave her a hypodermic shot and some pills. He said that he would charge $150 or $190 (she did not recall which). As she and her husband were leaving, appellant asked that they give him half the fee. Mr. Larriva gave appellant a check for $61.63. It was a payroll check from Douglas Aircraft Company. Mr. Larriva asked appellant for a receipt but appellant said he could not give a receipt for this kind of case, that he never gave receipts to his patients. There was a discussion about returning the following Friday. Appellant said that by then Mrs. Larriva's blood pressure would be higher so that he could operate upon her. He told her to take a pill every three hours for a week.

As Mrs. Larriva and her husband arrived home, she changed her mind and decided to go ahead and have the baby. She visited Dr. Sanchez June 17th. Actually, her family doctor was Dr. Villarreal. She had gone to the latter's office, but found he was not there. She told Dr. Sanchez she was pregnant and he gave her some vitamin pills for her headache. (She had stopped using the ones appellant gave her.) Mrs. Larriva was still in a state of mind where she was going to go ahead and have the baby. She had the same state of mind the following morning, Friday, June 18. During the day. defendant Arterbury telephoned and Mr. Larriva talked to him. Mrs. Larriva overheard her husband say that everything was all right and that he did not want Mrs. Larriva treated any more. Then Mr. Larriva hung up. This call was between 12 noon and 1 p.m. At about 3 p.m., Mr. Larriva left for work. Mrs. Larriva was still in the same state of mind to go ahead and have the baby. At about 6 p.m., Arterbury telephoned, and Mrs. Larriva talked to him. He asked Mrs. Larriva what was the matter, why she was not coming in. She told him that she was afraid that she was not going to go to the office any more. He told her to come on it, stating that nothing would happen to her and promising her that it would only be a slight pain. She came to the decision, after the telephone call from Arterbury, that she would terminate the pregnancy. The only thing which changed her mind was this telephone call.

Mrs. Larriva returned to the office in question at about 7 p.m., June 18. She went for the purpose of having an abortion. As she entered she saw appellant and Arterbury. They took her to the room where appellant had previously taken

her blood pressure. She removed her skirt and underclothing, and was directed to get on a table. She did so, lying on her back and placing her feet in stirrups. Arterbury was standing at her feet and appellant was at the door. Just before she got on the table, Arterbury took her blood pressure. He and appellant looked at each other. Arterbury then said it was all right and directed her to lie down. Arterbury placed a speculum into her private parts. Appellant told her nothing would happen to her. Both appellant and Arterbury told her not to be afraid. Arterbury also inserted a catheter. During the period of its insertion, appellant would say that it was too far in, that it should be a little farther out. At one time, Arterbury mentioned the word "abortion" to Mrs. Larriva stating that at first she would have some pains and then some bleeding. After the catheter was inserted, Arterbury gave Mrs. Larriva two shots. During this period, appellant would come in and out of the room. Arterbury placed what appeared to be gauze in Mrs. Larriva's privates. Appellant was present at the time and would say, "A little more." After the packing was completed, both Arterbury and appellant told Mrs. Larriva that she was all right, that she should not be afraid, that nothing would happen to her. Arterbury asked Mrs. Larriva how she was going to leave. She said she would leave in a cab. Arterbury said no. Presently, both Arterbury and appellant told Mrs. Larriva that they had telephoned her husband and that he would come to pick her up so that she would not be afraid. At one time, Arterbury spoke about being paid. Mrs. Larriva told both Arterbury and appellant that she would not pay a cent until she was well. While they were waiting for Mrs. Larriva's husband to arrive, Arterbury told her that the catheter would come out in 24 hours.

Mr. Larriva arrived at the office at about 10 p.m. He and Mrs. Larriva left, returning home at about 10:30 p.m. The catheter came out at about 1 a.m. Mrs. Larriva was experiencing dizziness. On Saturday, June 19, Mrs. Larriva felt very nervous and experienced some dizziness. She remained in bed. She telephoned Arterbury on Sunday, June 20, and told him that she was feeling pretty badly and that there was no bleeding. Arterbury asked her to wait until Monday. She said she could not wait that long and that she was going to contact her own physician. Arterbury told her not to do that and said that he would expect her that evening at 7 p.m.

The Larrivas returned to the same office that evening at about 6:30 p.m. Both appellant and Arterbury were there.

They both told Mrs. Larriva not to be afraid, that nothing was going to happen to her. They took her into the same room as before. She was placed on the table and put her feet in the stirrups. Appellant and Arterbury had her there for an hour and a half. Arterbury again inserted the speculum into Mrs. Larriva's privates. He also inserted a catheter. Appellant was present during the time that Arterbury was making the insertions. He would tell Mrs. Larriva not to be afraid. After the catheter was inserted, Arterbury inserted some gauze. Appellant told Arterbury to put in more gauze.

Before Mrs. Larriva left, Arterbury told her that the catheter would be expelled the following day and that she should call them. Appellant was present at the time. Arterbury asked when the Larrivas were going to pay them. Mr. Larriva told appellant and Arterbury not to worry about the money, to keep in mind that Mrs. Larriva's health was foremost. After Mrs. Larriva and her husband returned home, she went to bed and stayed in bed the following day, Monday. Somewhere around 1 p.m. she went to the kitchen to try to eat something. She had not eaten in three days. She had opened the ice box when she became very ill. Everything went dark. She yelled for her husband, then she fell and lost consciousness. When she awoke, she found she was at the General Hospital. She remained there 10 days. Her menstrual periods resumed two months after she returned home. She was no longer pregnant because she was operated on at the hospital.

Robert Larriva, the husband of the complainant, testified he was employed during the month of June, 1954, at the Douglas Aircraft plant in El Segundo. Defendant Arterbury was also employed there in the same department. During the first week of June, Maria told her husband that she believed herself to be pregnant. At some time around this first part of June, Arterbury came up to Mr. Larriva at the plant and said that he had heard that Mrs. Larriva was sick and that he knew a friend who could help Mr. Larriva out. He gave Mr. Larriva a piece of paper with an address and phone number on it. He said that it would be $150 for the operation. With respect to Mrs. Larriva's condition, Mr. Larriva had told Arterbury that his wife was already pregnant. The address on the slip of paper was on South Broadway and the telephone number had a PL prefix. It was decided between Mr. Larriva and Arterbury that Mr. Larriva and his wife would go to the address Saturday night, June 12. The Larrivas did go there on that date. · At the location Mr. Larriva saw appellant. The Larrivas first entered the receiving room. They also were in the second

room and in the operating room. On first meeting the Larrivas, appellant asked if they were the couple coming in for the examination. Mr. Larriva said yes, then appellant directed Mrs. Larriva to go to the operating room, and Mr. Larriva accompanied her.

Mr. Larriva saw appellant examine Mrs. Larriva and take her blood pressure. Appellant gave her a ''shot'' and some pills to bring her blood pressure up. Appellant said the price would be $150. Mr. Larriva said that all he had was his check from the Douglas Company for $61.17. He showed it to appellant. Appellant asked Mr. Larriva to endorse it. Mr. Larriva said that it was already endorsed. Appellant then said he would endorse it himself and cash it. Mr. Larriva left the check with appellant. Appellant tried to figure out the balance, using a couple of pieces of paper. He gave one of them to Mr. Larriva as a receipt. He said the Larrivas could give him some more money when they returned the next time. Mr. Larriva told appellant not to worry about it. Appellant asked Mrs. Larriva to return Friday, June 18.

On June 18, at about 1 p.m., the telephone rang at the Larriva residence. Mrs. Larriva answered. Mr. Larriva went over to her and took the receiver from her. He recognized Arterbury's voice on the telephone. He told Arterbury that everything was off, that his wife was not going down after all. Arterbury asked why. Mr. Larriva hung up.

Mr. Larriva left for work at 3 p.m. Around 9 p.m. he received a message to call a number with the prefix PL. He did so and recognized the voice of Arterbury on the telephone. Arterbury said that Mrs. Larriva was down there. Mr. Larriva said he did not believe it. Mrs. Larriva came on the telephone. Mr. Larriva left his place of work and went to appellant's office on South Broadway, the same place he and his wife had been on June 12. He saw his wife in the second room and he talked with her. Appellant and Arterbury came out presently from the rear.

After the Larrivas returned home, Mrs. Larriva did not sleep well. On Sunday night, June 20, after Mrs. Larriva had a telephone conversation, Mr. Larriva drove her down to appellant's office on South Broadway. Arterbury and appellant were present. Mrs. Larriva was directed to the operating room, and Mr. Larriva went with her. Mr. Larriva saw his wife get up on a table and put her feet in the stirrups that were there. Arterbury sat on a stool near Mrs. Larriva's feet. Arterbury gave Mrs. Larriva a shot. Appellant would come

in and out of the room. Mr. Larriva saw Arterbury insert a speculum into his wife's privates. Next, Arterbury inserted a catheter. Appellant looked in the direction of where Arterbury was working and said, "That's fine. Just a little bit more."

After the Larrivas returned home, Mrs. Larriva did not sleep peacefully. At perhaps 1 p.m. the next day, June 21st, Mr. Larriva heard his wife yelling for him from the kitchen. He went there and saw that his wife was on the floor. He picked he up and put her to bed, then called an ambulance. Mrs. Larriva was taken to the County General Hospital.

On Wednesday, June 23rd, Mr. Larriva went to appellant's office in company with Officers Galindo and Bates. Mr. Larriva and Officer Galindo went inside where they saw appellant. Mr. Larriva introduced Officer Galindo as his brother-in-law. Mr. Larriva had a conversation with appellant after which appellant was placed under arrest.

Dr. Robert Dooley, osteopathic physician and surgeon licensed to practice in the state of California, testified he was attached to the Los Angeles County General Hospital. He saw Maria Larriva and examined her on June 21, 1954, at the hospital. He first observed her at 12 o'clock at night. He made a bi-manual examination, checked her blood pressure, and did a cursory physical examination, as well as talking to the patient through an interpreter. His diagnosis at the time was probable, threatened, septic abortion, induced. He also made a diagnosis of a possible perforated uterus. About an hour later, Dr. Dooley and a gynecologist made a further examination of the patient and concluded that she had a hemoperitoneum, that is, the abdomen was filled with blood. An exploratory laparotomy was performed, that is, her abdomen was opened surgically. As a result of this laparotomy, a ruptured cornual, ectopic pregnancy was disclosed. This is a pregnancy which starts developing within the Fallopian tube instead of inside the uterus. The tube had ruptured causing the products to be expelled in the abdomen. The tube was amputated. The length of pregnancy was approximately eleven weeks.

If Dr. Dooley found a pregnancy, which he determined to be an ectopic cornual pregnancy, he would operate: he would remove the Fallopian tube which was affected with the pregnancy. He would perform an operation similar to the one performed on Mrs. Larriva. This is the accepted method for that type of operation in the community. (It would be possible to remove the tube vaginally.)

Dr. Dooley testified that the symptoms of such ectopic pregnancy would include vaginal bleeding, pain, palpatory findings on a bi-manual examination, absence of menstrual period. No positive diagnosis of this condition could be made without a surgical incision. In making this type of diagnosis, there is no use to which a catheter could be put. In the removal of the Fallopian tube in such a case, there is no use to which a catheter could be put.

The end result of an ectopic pregnancy in the cornual Fallopian tube would be a rupture. If nothing was done about the rupture, the patient might die from loss .of blood, the patient might develop acute peritonitis and die from sepsis, or the patient might live. With a condition of an ectopic cornual pregnancy in a Fallopian tube the effect of inserting a catheter into the uterus would be: that nothing would happen, that the uterus would be perforated, or the pressure might rupture the tube.

It would be possible for a catheter inserted into the uterus to enter the Fallopian tube. In Mrs. Larriva's case the pregnancy was one which was in the tube close to the uterus. In such pregnancy it would be possible for the catheter, on insertion, to rupture the pregnancy.

Dr. Dooley's attention was called to the catheter denoted People's Exhibit No. 6. In his opinion, it was doubtful if that catheter could be passed so as to cause a rupture of the tube without a guide (a metal wire) inside the catheter. If, however, the opening into the uterus was a little enlarged, it would facilitate passage of the catheter. The hospital records for Mrs. Larriva disclosed that the opening in her case was a large one; consequently, such a catheter as the one in question could be passed without a guide. This catheter was about 14 or 15 inches long. In a case of an 11-week pregnancy the distance from the opening of the uterus to the Fallopian tube is about 4 to 6 inches and the distance from the opening to the outside wall is about 8 inches.

(The hospital records showed that Mrs. Larriva's blood pressure, at the time she entered the hospital, was nothing over nothing. The reason for this was that she was in shock.)

Dr. Alphonso Sanchez, a medical doctor licensed to practice in California, had Mrs. Larriva as his patient on June 17, 1954. He did a physical examination and a pelvic examination. He made a diagnosis of pregnancy between 2½ to 3 months and a diagnosis that Mrs. Larriva's general state of health was good. She complained of nervousness, shortness

of breath, frequency of urination, headache, and morning sickness. He diagnosed pregnancy from these symptoms. He made no type of diagnosis as to an ectopic, tubal or cornual pregnancy. He took her blood pressure and found it to be normal for a pregnant woman.

Dr. Rafael Villarreal, a medical doctor licensed to practice in California, saw Mrs. Larriva on April 14, 15 and 16, 1954. She came to him for some injections. Dr. Villarreal made a diagnosis of delayed menstrual period from which he presumed a pregnancy. In his opinion, Mrs. Larriva's general state of health was good. As he recalled, her blood pressure was normal.

Police Officer Danny Galindo was one of the investigating officers in the case at bar. He testified he went to the office of appellant on June 23, 1954 at about 4 p.m. with his partner, Officer Glen Bates, and Mr. Larriva. Officer Bates stayed in the car while Officer Galindo and Mr. Larriva entered the premises. In about a minute, appellant came into the reception room where Mr. Larriva and the officer were. Mr. Larriva introduced the officer to appellant as his brother-in-law. Mr. Larriva said to appellant: "Doctor, I've come to get the money that I gave you for what you did to my wife, because on account of what you did to my wife she is very ill. She's at the General Hospital, and I'm going to have to pay a terrific hospital bill." Appellant said: "Oh, I've been expecting to hear from you. I thought you would phone me." At this time, they walked into the hallway towards appellant's office and Mr. Larriva stated that he was going to have to have the money that day because he was going to have to remove his wife from the hospital, having been told that since both of them were working they were not eligible for county hospital aid. Appellant said he did not have the money, that Arterbury had the money and that appellant could get it from Arterbury the first thing in the morning. Mr. Larriva said he was going to have to move his wife that night and would have to have the money then. Appellant said that the banks were closed and that he was sure that he could get the money for Mr. Larriva the first thing in the morning. Mr. Larriva went outside and came back with Officer Bates. At this time, Officers Galindo and Bates identified themselves to appellant as police officers and told him he was under arrest on suspicion of performing abortions.

Officer Galindo sat down with appellant in the latter's office while Officer Bates proceeded to search the premises. The officer asked appellant if he was acquainted with a Mrs. Maria

Larriva. Appellant said that if the officer meant the wife of the gentleman who was talking with him a few minutes ago, it was true, that he had examined her a couple of weeks ago. Appellant said he had done prenatal work on her and that he charged $10. He said he had not given her a receipt. He said he thought there might be a clinical chart for Mrs. Larriva on the desk. The officer searched the desk and brought out appellant's file folder which he went through. Appellant looked through it a little bit and said he guessed he did not make one out. The officer showed appellant the latter's daily log and asked appellant if he was in the habit of making entries for any examinations or treatments therein. Appellant said he did. Appellant was unable, however, to find any entry as to $10 for the treatment of Mrs. Larriva. Officer Bates came into the room and showed appellant a receipt. Appellant said he had written the receipt. Officer Bates said it was made out for $61.17 and asked appellant for an explanation, appellant having again stated that he had charged $10 for Mrs. Larriva's examination. Appellant said Mr. Larriva had given him a check for $61.17. Officer Bates directed appellant's attention to a notation on the back indicating a balance of $88.83. Appellant said this sum was what would be owed to Dr. Arterbury because Arterbury had quoted the Larrivas a fee of $150. Officer Galindo asked appellant if by ''Dr. Arterbury'' appellant meant Joel Arterbury who was allegedly not a doctor in fact. Appellant said, ''Yes, he is not a doctor. I suppose you will find out sooner or later.'' Officer Galindo asked appellant what he had done with the check. Appellant said he had cashed it, as he recalled, the day after he had examined Mrs. Larriva. He said he had spent the money and had not given any to Arterbury. He explained that he had gone to the bank and endorsed the check there. Officer Bates asked appellant if he had a speculum on his premises and he said he did. He acknowledged that it was the same one which was in the sink in the office. Officer Bates showed appellant the speculum, and appellant acknowledged it was his. Just before showing appellant the speculum, Officer Bates said that the police had information that Mrs Larriva had been in appellant's office in the presence of Arterbury, at which time Arterbury had introduced a speculum into Mrs. Larriva's privates. Appellant said that Mrs. Larriva was Arterbury's patient. Officer Galindo asked appellant if Arterbury was a qualified chiropractor. Appellant said Arterbury had graduated from a school of chiropractics but had not yet taken the examination.

Officer Galindo asked appellant if he was in the habit of allowing unqualified personnel to use his office to examine patients Appellant said he had not given it much thought, that he did not feel there was a violation inasmuch as Arterbury had been to school. Appellant acknowledged that Arterbury used appellant's speculum, and that he observed Arterbury insert it into Mrs. Larriva's privates. Officer Galindo asked appellant if he had made any entry of the $10 he received as his share of the $61.17 in his daily log book for the purpose of reporting it to the Bureau of Internal Revenue. Appellant opened the book again. The officer pointed out there was no entry of $10 for examination of Mrs. Larriva. Appellant claimed the examination had been on June 11th. There was no entry for that date. Officer Bates asked appellant if he had received two checks for $61.17. Appellant said he did not. Officer Bates showed appellant the receipt, and asked if that had any relation to the other receipt of $61.17. Appellant said no, that he had written that one first and then thrown it away. Officer Bates turned the receipt around and pointed out several instances where a notation of $61.17 was made, and where there was a notation of $75 less $61.17 and underneath a sum of $14.83. Appellant said, with reference to these notations, that he was just doing some figuring on the back, that the receipt was all written on the back so he threw it away and gave Mr. Larriva another receipt.

In searching the premises, Officer Galindo found the catheter. It was in the lower portion of the examining table in appellant's examining room. Officer Galindo asked appellant the reason for having the catheter. Appellant said that he did not know, he just had it around the office. Later that night, the officer had another conversation with appellant, in a police car in front of the 77th Street Police Station. Also present were Officer Bates, and Arterbury. Officer Galindo asked appellant if he had let Arterbury use his office for the purpose of examining a Mrs. Larriva on the night of June 18, 1954 and appellant said he had. The officer asked appellant if he had let Arterbury use his office on the night of June 20 and appellant said yes.

Testifying as a witness in his own behalf, defendant Arterbury testified that he examined Mrs. Larriva prenatally. That Mr. Larriva told him at the Douglas Aircraft Corporation that the latter's wife was very sick, that she was pregnant, and asked if Arterbury could look at her; that Arterbury said he probably could and that an appointment was made for Mrs. Larriva to be looked at by Arterbury at appellant's office, 6027

South Broadway; that there had been no discussion between Arterbury and appellant as to miscarriage of a baby; that Arterbury saw Mrs. Larriva June 18, 1954 at appellant's office and gave her a pregnancy examination; that both this examination and the one of June 20 were prenatal. He testified that he had passed the examination but that he was not yet licensed as a chiropractor. On cross-examination, he testified that he graduated from chiropractic college in August, 1951, and took the examination in January, 1954; that he did not know the results of this examination until August, 1954; that he and appellant were classmates at the college. He testified that about June 2, 1954, he called appellant and said he had a patient and that appellant said he could use the latter's office; that there was no discussion as to Arterbury's status with the State Board; that he called appellant later and made arrangements for the use of appellant's office June 5th; that he went there on that occasion and saw appellant; that he told appellant he was expecting a patient; that the subject of his status before the State Board never came up; that the Larrivas did not keep the appointment. He testified further then an appointment was made for him to see Mrs. Larriva at appellant's office June 12; that he found he could not be there then so he called appellant and asked appellant if the latter could look at the patient who was coming in; that Arterbury talked to appellant afterward by phone and appellant said that he found Mrs. Larriva's blood pressure was low and needed building up, that she was slightly anemic and seemed in pretty fair health; that he did not think the subject of pregnancy was mentioned; that there had been no conversation between himself and appellant about money; that he called appellant later and told him the patient was coming back on June 18; that there was no discussion of money; that he went to appellant's office June 18 where he saw appellant, who agreed to Arterbury using the office; that Mrs. Larriva and her mother arrived; that at this time appellant was in the back room; that Arterbury took Mrs. Larriva and her mother into the operating room; that appellant was not present; that while Arterbury was escorting Mrs. Larriva through the premises, they saw appellant who spoke casually to Mrs. Larriva; that to the best of his (Arterbury's knowledge, appellant did not come into the room when he was examining Mrs. Larriva; that after the examination of Mrs. Larriva, he talked to appellant and said he thought Mrs. Larriva had an abnormal pregnancy; that there was no discussion between himself and appellant as to money; that the

telephone number of appellant's office had a prefix of PLeasant and he had given this number to Mr. Larriva at the Douglas plant; that he phoned appellant subsequently and asked if he could use appellant's office June 20 with respect to the same patient and appellant agreed; that Arterbury arrived at appellant's office a little after 5:00 p.m. and that appellant himself came shortly afterward with his 12-year-old daughter; that Arterbury just told appellant that the same patient was coming back; that shortly afterwards the Larrivas came; that there was no conversation that night between Arterbury and appellant concerning money; that he and appellant stayed in different rooms while waiting for the Larrivas and that he took Mrs. Larriva back to the examination room.

Subsequently, in his testimony, Arterbury recalled that he and appellant had talked about money with respect to Mrs. Larriva; that this was on the Sunday after she was at appellant's office June 12; that appellant had phoned him and told him; that the Larrivas came to the office Saturday night, June 12, and that he (appellant) examined Mrs. Larriva and thought she was pregnant, that he gave her some tablets and checked her blood pressure, that Mr. Larriva had given him some money in the form of a check, about $61 and some cents, and that he was going to use the money; that Arterbury said this was all right.

Arterbury testified further that appellant told him he had charged the Larrivas $10 for his examination; that appellant said that $10 of the check would be his for the examination and the remainder would be Arterbury's.

During cross-examination by counsel for appellant, Arterbury testified in part that appellant never came into the room where he was examining Mrs. Larriva on June 18; that he guessed appellant was somewhere about the premises of the building; that he saw appellant when he (Arterbury) came out of the examining room; that he thought appellant was in the lounge in the rear; that there was a Mrs. Manos with appellant; that appellant did not come into the room where Arterbury was examining Mrs. Larriva on June 20; that he saw appellant's daughter there.

Appellant took the stand in his own defense and testified, among other things: that he was a Doctor of Chiropractic, with his office at 6027 South Broadway; that Arterbury was a classmate of his and that Arterbury called him around June 3rd or 4th, 1954; that Arterbury said he had a possible pregnancy case and wanted to do the prenatal and delivery

and asked if he could use appellant's office; that appellant agreed; that appellant knew Arterbury had graduated and thought Arterbury was licensed; that Arterbury called on June 5th and requested use of the office for that evening; that Arterbury came there that evening and stayed for several hours; that Arterbury phoned him again around June 7 or 8 and said he had made another appointment with the patient for the 12th and asked use of the office that night, to which appellant agreed; that Arterbury phoned him June 12 and said he could not be in that night, that Mr. and Mrs. Larriva were the patients coming in and that if they did come in to have them contact Arterbury for a new appointment; that the Larrivas came in that evening; that Mr. Larriva said his wife was not feeling well and asked if appellant could do something for her; that from statements Mrs. Larriva made in Spanish, through her husband, appellant presumed she was pregnant; that he took her blood pressure and temperature and recorded them; that the blood pressure was low and that he gave Mrs. Larriva some tablets to build it up; that he may have palpated her abdomen; *that he found nothing which would lead him to believe she was in a critical condition*; that Mr. Larriva asked appellant how much he owed and appellant said $10; that Mr. Larriva said Arterbury was charging him $150 and asked if he could give appellant a check from Douglas for $61.17, if appellant would give the money to Arterbury; that appellant started to write a receipt for the check; that Mr. Larriva said he changed his mind and would just pay $10; that appellant started to write another receipt for $10; that Mr. Larriva asked what the balance would be if he did pay the amount of the check; that appellant figured the balance; that Mr. Larriva finally gave appellant the check which appellant endorsed and cashed. Appellant testified further that he called Arterbury on June 13 and told him about the visit of the Larrivas, that they had given a check for $61.17 and he had $51.17 of Arterbury's money that he would give to him; that appellant asked if he could use this money and reimburse Arterbury later and Arterbury agreed; that Arterbury called appellant on June 18 and asked if he could use the office that night and appellant agreed; that Arterbury arrived at about 5:30 p. m.; that appellant was in the lounge when Mrs. Larriva arrived; that appellant saw her in the hallway and a woman was with her; that appellant said good evening to her and she bowed her head; that the two women and Arterbury

went into the office and appellant went back to the lounge where he had a discussion with an insurance agent, Mrs. Manos, with whom he had an appointment; that he knew that the others left the office and went into the examination room; that appellant had a speculum in the office and also a catheter; that appellant remained in the lounge with Mrs. Manos; that he saw Mr. Larriva later in the hallway; that presently the Larrivas left and that Arterbury said something to appellant about Mrs. Larriva's condition; that Arterbury phoned appellant June 20th and obtained his consent to use the office again for his patient; that appellant went to the premises around 5 p. m. with his daughter and that Arterbury was there; that appellant went into his office with his daughter where he checked over some records; that the Larrivas arrived around 5:30 p. m.; that Arterbury met them and brought them past the office door and into the examination room; that appellant remained in his office except for a period when he went across the street and bought some cigarettes and soft drinks; that presently the Larrivas left; *that appellant never did anything other than a prenatal examination on Mrs. Larriva;* that he never said anything to Arterbury concerning the use of, or insertion of, a catheter; that other than the $10 he never had any agreement with Arterbury concerning any money in the case; that he never talked to Mrs. Larriva and that he never told Mr. Larriva he was going to operate on Mrs. Larriva on a Friday night; that he never discussed any type of operation with Mr. Larriva and that he never gave Mrs. Larriva any shot.

During cross-examination, appellant acknowledged that he knew in January, 1954, that Arterbury was not licensed to practice; that he knew Arterbury was taking the State Board examination that month; that in March, Arterbury told appellant he was licensed. Appellant testified that Arterbury was mistaken if he said that the results of the examination which he took came out in August; that the results came out in March or the first of April. Appellant testified further that he made no log entry regarding the $10 he charged the Larrivas; rather, that he kept the whole receipt. He asknowledged that on neither one of the receipts did it show that he received $10. Appellant testified that he was to obtain $10 out of the $61.17 which Mr. Larriva paid and that that would leave $51.17 for Arterbury; that the figure $88.83 was the balance Mr. Larriva owed Arterbury of the total price of $150; nevertheless, that the subtraction of $51.17 from $150.00

did not come out to $88.83. Appellant acknowledged that in a conversation with Officer Galindo he might have said that Arterbury used his speculum, although he did not recall, or denied, stating certain other matters as to which the officer testified.

Other witnesses for the defense included appellant's 11-year-old daughter, Sandra, and Mrs. Myrtle Manos, who testified by way of corroborating appellant's testimony that they were at his premises with him on certain occasions; and character witnesses.

Among other things, Sandra testified that her best guess as to the time she was at appellant's office was on a Sunday in July, 1954. She testified that she met a pregnant woman at the premises; that she concluded this woman was pregnant because her stomach was rather large. (In his own testimony, appellant stated that Mrs. Larriva's stomach was extended a little bit, on June 20, 1954, when his daughter was at the premises with him.)

Among other things, Mrs. Manos testified that she was a friend and former patient of appellant; that she was at his premises on the occasion in question to sell him insurance and that a possible deal was still pending as of the time of trial. Her testimony was to the effect that appellant stayed in the lounge where she was throughout the period from her arrival at the premises to the time she left. (In his own testimony, however, appellant stated that he spoke to Mrs. Larriva in the hallway and then went back into the lounge, where Mrs. Manos was.)

As his first ground for reversal appellant contends that the evidence is insufficient to support his conviction because the People failed to establish that any operation performed was not necessary to preserve life within the meaning of the exceptions contained in section 274 of the Penal Code. *People v. Gallardo*, 41 Cal.2d 57 [257 P.2d 29], states that the non-necessity *may* be shown by evidence that the woman upon whom the operation was performed was in good health prior thereto, and that her testimony as to her physical condition would be sufficient on that issue. In the instant case, while it is true Mrs. Larriva testified that prior to June 12 (her first contact with appellant) she suffered from headaches, dizziness, low blood pressure and shortness of breath, nevertheless, there was testimony by Dr. Sanchez, a licensed physician, that he made a physical and pelvic examination of Mrs. Larriva on June 17, 1954 and diagnosed her general health

as good. That the symptoms she complained of were consistent with his diagnosis that she was pregnant. This doctor also took the blood pressure of Mrs. Larriva and found it was normal for a pregnant woman. He made no type of diagnosis as to her ectopic cornual pregnancy.

Another licensed physician, Dr. Villarreal, testified he had seen Mrs. Larriva about a month prior to Dr. Sanchez, and, in his opinion, her general state of health was good.

Appellant directs our attention to the testimony of Dr. Dooley as to the finding of an ectopic cornual ruptured, pregnancy when Mrs. Larriva underwent surgery at the General Hospital, and insists that this testimony showed that an operation was necessary to save the life of the patient; that the type of pregnancy in question would have resulted in a rupture of its own accord eventually. However, the ultimate issue involved is whether the particular acts *committed upon Mrs. Larriva at appellant's premises were necessary to save her life.* We are satisfied that from the foregoing evidence, conflicting though it be, the jury was reasonably warranted in concluding that the acts in question were not performed in a case of emergency; that the woman in question was, except for the fact that she was pregnant, a normal, healthy woman, and that the acts in question were not done to preserve life. It is also noteworthy that appellant himself testified that in his examination of Mrs. Larriva he found nothing which would lead him to believe that she was in a critical condition, and denied that he performed any operation upon her.

Appellant next asserts that the court committed reversible and prejudicial error in refusing to instruct the jury on appellant's defense of alibi. This he bases upon his testimony that he was never at any time in the room where any examination of Mrs. Larriva took place at his premises June 18 and June 20, and to the testimony of Mrs. Manos and of his daughter, Sandra, by way of corroboration. In his testimony, appellant did acknowledge that he was at his premises on Broadway on each occasion in question, and that he did see Mrs. Larriva there.

From the testimony herein narrated concerning the relatively small space involved in the premises where the alleged acts occurred, it is manifest that the defense of alibi could not be applicable in such a situation. In 22 Corpus Juris Secundum, section 40, page 97 (relating to the defense of alibi in criminal law) it is stated:

". . . This defense is designed to prove that accused, during

the whole time that the crime was being committed, was so far from the place where the crime occurred that he could not have participated in it, or that he was so far away that he could not, with ordinary exertion, have reached the place in time to have done so . . ." (Footnote reference is had to *Hodge* v. *State*, 174 Ark. 1179 [298 S.W. 877], wherein it was held that an accused, living on the premises where a still was found, could have no alibi defense.) Furthermore, the jury was fully, fairly and correctly instructed, and the testimony and reasonable inferences therefrom definitely established appellant's connection with the premises and his presence thereon at the time here in question. It is implicit in the jury's verdict that they believed the testimony establishing appellant's presence in the room involved and his participation in the acts charged as having occurred therein, and did not believe the "alibi" story of appellant and his witnesses. It follows that to have given the requested instruction on the subject of alibi would not have added any credence to their story and a different verdict would not have ensued. Hence, there was no prejudice in the court's failure to give an instruction on the subject of alibi, particularly in view of the general instructions actually given.

■ It is next contended by appellant that the court was guilty of prejudicial and reversible error in giving instructions concerning the testimony of an accomplice. The court instructed the jury that, "It is the law that the testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." To the foregoing portion of the instruction appellant does not object, but insists it was error for the trial judge, on his own motion to add thereto, the following: "In giving this instruction I do not mean to imply any opinion of my own as to the credibility of any witness." Appellant places great reliance upon the case of *People* v. *Dail*, 22 Cal.2d 642, 653 [140 P.2d 828]. However, in the case just cited the court instructed the jury that the credibility of accomplice witnesses is to be judged by the same standard as that of other witnesses. The Supreme Court held that such an instruction was in direct opposition to the statutory provision that the testimony of an accomplice should be viewed with distrust (Code Civ. Proc., § 2061, subd. 4). The situation presented in the Dail case is therefore not

analogous or comparable to that presented in the case at bar, wherein the challenged portion of the instruction may not be said to have weakened, modified or detracted from the previous portion. The two portions were not opposed to each other and the trial judge did not indicate any opinion of his own as to the guilt or innocence of the accused. (*People* v. *Westek,* 31 Cal.2d 469, 481, 482 [190 P.2d 9]; *People* v. *Ernst,* 121 Cal.App.2d 287, 295, 296 [263 P.2d 114]; *People* v. *Ahsbahs,* 77 Cal.App.2d 244, 250, 251 [175 P.2d 33]; *People* v. *Arechiga,* 72 Cal.App.2d 238, 240 [164 P.2d 503].) Appellant relies upon the recent case of *People* v. *Lyons,* (Cal.App.) 286 P.2d 993, wherein it was held that addition of the latter portion of the instruction here under attack was error. However, the Supreme Court has granted a hearing in that case.

Appellant insists that the court erred to his prejudice in instructing the jury regarding the law of conspiracy when no conspiracy was pleaded in the information and no overt acts were set forth to establish a conspiracy. ▉ It has long been the law of this state that the fact a conspiracy was not pleaded in the information or indictment does no preclude the prosecution from proving the existence of a conspiracy if one actually existed (*People* v. *Tanner,* 3 Cal.2d 279, 299 [44 P.2d 324]; *People* v. *Davis,* [1]133 Cal.App.2d 558, 560 [284 P.2d 496]; *People* v. *Whelpton,* 99 Cal.App.2d 828, 832 [222 P.2d 935]).

Appellant however, contends that if the court did have the right to instruct the jury on conspiracy, it was reversible error not to instruct them to the effect that mere association and presence is not enough to prove that the accused was a member of the alleged conspiracy.

▉ While the instruction might well have been given, we are persuaded that under the facts and circumstances here present no prejudicial error ensued to appellant because of the failure so to do. It is elementary that instructions must be viewed in their entirety and when that is done in the case at bar, we are satisfied that the jury was neither misled nor confused. The court instructed the jury that a conspiracy is defined as an agreement or understanding between two or more persons that they will commit an unlawful act. In this instruction, the court elaborated on the scope of such agreement. In certain other instructions on conspiracy (as to overt act; as to proof of an express agreement not being necessary; as to proof by circumstantial evidence) the word "agreement" appears. The court instructed that no act or declaration

of a conspirator outside the common design and not in further-ance thereof is binding upon a coconspirator. The jury was also instructed as to the period when responsibility is imputed to a conspirator for the acts and declarations of a coconspir-ator; that the jury must decide separately the guilt or innocence of each of the two defendants; and that the jury must consider the instructions as a whole. Appellant relies upon the case of *People* v. *Mata,* 133 Cal.App.2d 18 [283 P.2d 372], in which case it was held that if conspiracy instructions were to be given, it should have been made plain to the jury that mere association is not enough to estab-lish a conspiracy. However, in the cited case, the court based such holding on the fact that the evidence was confusing as to "which two defendants were involved in the Cluff episode, as to which defendant struck Private Moore, and as to what each defendant was doing at any given time." No such situation existed in the instant case and as heretofore pointed out, the jury was fully and adequately instructed upon the law of conspiracy.

Appellant's contention that the record contains no proof of conspiracy is without merit. In the case of *Bunker* v. *Superior Court,* 96 Cal.App.2d 107 [214 P.2d 825], cited by appellant, there was a complete absence of any evidence that the accused took part in, or knew of the contemplated abortion. A reading of the evidentiary narrative above set forth imme-diately suggests the dissimilarity between the Bunker case and the one now engaging our attention.

Appellant complains that the court erred and abused its discretion in refusing to grant him a separate trial because of conversations between the husband of the victim and the codefendant Arterbury outside the presence of appellant, and testimony of admissions made to the police by Arterbury which were inadmissible as to appellant. And, also because there were two independent acts of abortion alleged. ■ An accused is not entitled to a separate trial as a matter of right (Pen. Code, § 1098). A motion for a severance must be decided upon the showing made at the time the motion is made and not upon what may have transpired thereafter at the trial. ■ In the instant case the judge admonished the jury that no act or declaration of a coconspirator outside the common design and not in furtherance of that design was binding upon a coconspirator, and that the jury must con-sider the evidence applicable to each alleged offense as though it were the only accusation before the jury. On the occasion

when testimony as to statements of Arterbury to the police, outside the presence of appellant, were offered the court advised the jury that they were admitted only with reference to Arterbury and were not to be considered with reference to appellant. With respect to another conversation, the court also similarly advised the jury. Thereafter the court instructed the jury to disregard completely any evidence in connection with one defendant, which evidence was admitted only as to the other defendant. We perceive no abuse of discretion in the ruling of the court denying appellant a separate trial (*People* v. *Santo*, 43 Cal.2d 319, 331, 332 [273 P.2d 249]).

■ Finally, appellant predicates prejudicial error on the action of the trial court in admitting into evidence the general hospital records of Mrs. Larriva without striking therefrom certain claimed prejudicial portions about which independent testimony could not be given. In this regard, appellant objected specifically to (1) a notation in the hospital records that there was a telephone conversation with a Mr. Buckley in Homicide (a division of the police department) and that the case was reported as probable criminal abortion; (2) to notations indicating a relating of the patient's history by the husband of the patient, including a statement that the patient was approximately three months pregnant; and (3) to a notation of a diagnosis of probable criminal abortion. The trial judge sustained the objection to the matter denoted (1) above, and said that he would have the clerk cover it so that the jury would not see it; but overruled the objections to the other matters, commenting to the effect that a doctor may testify to conversations called "history" upon which he bases his diagnosis, and that the diagnosis itself is admissible.

Dr. Dooley, who was resident at the County Hospital, testified that the medical record in question contained a physical history of Mrs. Larriva from the time she was brought to the hospital to the time she left, including follow-up as an out-patient; that such a file is kept for every patient brought to that hospital; that the witness was familiar with the records kept by the hospital for the patients brought there; that these records are kept in the ordinary course of business at the hospital; that the record in question was such a record and so kept. Dr. Dooley also testified that his diagnosis at the time of his initial examination of Mrs. Larriva was probable, threatened, septic abortion, induced; that after the abdominal incision and the finding of a ruptured pregnancy, the original diagnosis was altered; that Mrs. Larriva was approximately

eleven weeks pregnant. We are satisfied that a proper foundation was laid for the introduction of the hospital records (*People* v. *Gorgol,* 122 Cal.App.2d 281, 299, 300, 301 [265 P.2d 69]), and further that when consideration is given to the testimony of Dr. Dooley, and the instructions given, appellant was not prejudiced. As pointed out by respondent, "In *People* v. *Powell,* 34 Cal.2d 196, 204-205 [208 P.2d 974] (a prosecution for abortion and murder), medical opinion-testimony was considered admissible even though it was based in part upon the patient's case history and *even though the history included statements by the patient's husband.* Likewise, hospital records containing medical opinion based in part upon such history were considered admissible. In the Powell case the matter was heard by the court sitting without a jury. It was assumed that the trier of fact did not view the opinions in question as if they had been based solely upon the doctors' own knowledge. We submit that it would be incumbent upon a defendant in a jury trial to request an instruction as to the specific value of such evidence, before error could be predicated. (*People* v. *King,* 104 Cal.App.2d 298, 309 [231 P.2d 156] ; *Tierney* v. *Charles Nelson Co.,* 19 Cal.App.2d 34, 37-38 [64 P.2d 1150].) In the case at bar, no such instruction was requested. The jury was instructed, however, on evaluating expert testimony and was instructed specifically on what constitutes the crime of abortion."

We do not wish to be understood, however, as approving the ruling of the trial court admitting into evidence the notation in the hospital record "Diagnosis (1) prob. criminal abortion." The trial court should have sustained the appellant's objection to this evidence for two reasons. In the first place, it constituted a conclusion to which the doctor who made the notation could not have testified to if called as a witness. Whether or not the abortion was a criminal one was the very issue to be decided by the jury and was not a matter upon which an expert was entitled to express an opinion. In the second place, an opinion is not one of the matters the record of which may be received in evidence under section 1953f, Code of Civil Procedure. In order for a record to be competent evidence under that section it must be a record of an act, condition or event; a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion; it may or may not be founded upon sound reason; the person who has formed the conclusion recorded may or

may not be qualified to form it and testify to it. Whether the conclusion is based upon observation of an act, condition or event or upon sound reason or whether the person forming it is qualified to form it and testify to it can only be established by the examination of that party under oath. In the ordinary affairs of life men act upon records of acts, conditions or events made in the ordinary course of business and this fact and the fact that the rules of evidence had surrounded the use of such records, as evidence, with so many technicalities and hair-splitting refinements, led to the formulation and the adoption, by many of the states, of the "Uniform Business Records as Evidence Act" but these reasons do not apply to the record of a conclusion which in reality but reflects the state of mind of the person expressing the conclusion. It is true that some diagnoses are a statement of a fact or condition, for example, a diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors. However, as heretofore pointed out, in view of the testimony of Dr. Dooley, no prejudice ensued to appellant.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

Doran, J., and Nourse (Paul), J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 18, 1956. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.