[Crim. No. 7146.   Second Dist., Div. Two.   Dec. 14, 1960.]

THE PEOPLE, Respondent, v. CEPHES WILLIAMS, Appellant.

Simmons & Simmons and Herbert W. Simmons, Jr., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David R. Cadwell, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant was convicted of the murder of Margarete Heitmiller, murder in the first degree with life imprisonment fixed as the penalty. He appeals from the judgment and an order denying his motion for new trial.

Counsel make no claim of insufficiency of the evidence but advance numerous assignments of error claimed to be prejudicial. One of them centers upon the exclusion of

certain proffered evidence concerning the propensity of decedent after drinking a small amount of alcohol to suffer convulsive episodes leading to numerous injuries of her person. This evidence was offered as corroboration of defendant's testimony as to the events immediately preceding Margarete's death. Appellant's brief thus summarizes the purpose and effect of the excluded evidence: ''That the evidence concerning the mental capacity, physical condition and past conduct of the decedent, if admitted into evidence would have corroborated the testimony of the defendant. The testimony of the defendant without the corroboration of the rather weird and psychotic behavior of the decedent appeared to be unbelievable and thus was extremely prejudicial to the defendant. . . . Clear examples of the miscarriage occasioned by this ruling is demonstrated when the defendant testified as to a sort of skip-step the deceased was doing the night of the incident, the propensity of the decedent to run in the streets after consuming small quantities of beer, the pounding of her own head against a concrete floor, the jumping out of a window in response to a non-existent danger, the antagonism against her family and public authorities and the numerous self-inflicted strangulations which resulted in bruises primarily on one side of the throat of the deceased. That each of these events found their counterpart in the testimony introduced at the time of trial.''

The condition of decedent's body was such that Dr. Kade, deputy medical examiner and autopsy surgeon in the coroner's office, expressed the opinion that the cause of death was a fractured skull with lacerated brain, fractured fourth cervical vertebra (broken neck) and other injuries; that the body showed a $\frac{1}{2}$-inch laceration of the scalp to the left of the vertex, and a $\frac{3}{4}$-inch by $\frac{1}{4}$-inch T-shaped laceration of the right occipital area of the scalp; a reddish purple discoloration and swelling about the left eye, which would commonly be called a black eye; scattered abrasions of the left side of the forehead and of the right cheek, right upper lip and undersurface of the right side of the chin; a large area of ecchymosis and discoloration of the left side of the neck; zones of ecchymosis on both upper arms; a scratch mark over the right clavicle, the collar bone; zones of abrasion about both elbows and the left forearm; a bluish discolored area on the back of the left hand; zones of abrasion on both lateral aspects of the torso; marked ecchymosis and swelling of the right labia, extending as far as the margin of the vagina;

ecchymosis and swelling of the internal surface of the left thigh, just below the buttocks; linear abrasion on the anterior aspect of the left thigh; kneecap areas skinned and bruised, and a zone of ecchymosis on the posterior aspect of the right thigh, just above the knee. The lungs were congested and partially filled with accumulated blood, but showed no pneumonia or lung disease which might account for the death. An examination of the upper wind passages showed an area of hemorrhage on the left side of the voice box, which corresponded to the bruised area on the left side of the neck; this mark showed that considerable pressure had been applied, which had caused an injury in that area; the size and position of the last mentioned mark, as well as one on the opposite side of the neck were in characteristic position, location and size for manual strangulation, commonly known as being throttled or choked to death. The witness further said there was no evidence of injury to internal organs nor evidence of any intestinal or stomach diseases. Also, that there was a fracture of the second rib, which is immediately below the collarbone, about 4 or 3 inches to the right of the center of the body. There were no cuts or tears on the lung as a result of that rib fracture. There was also a fracture of the fourth cervical vertebra, eliciting distinct abnormal motility and crepitation of the fragments on gyration and rotation of the head. The amount of shift, caused by this injury, indicated that the spinal cord was bruised by the shifting of those bones. Turning back the scalp, there was revealed extensive hemorrhage beneath the lacerations on the scalp, which were previously described. There was considerable hemorrhaging around the brain, but no signs of any antecedent disease therein. The spinal cord revealed a zone of softening and hemorrhages into the surrounding membranes at approximately the same level as the fourth cervical vertebra. The cord itself was definitely bruised, but wasn't completely cut across or torn. Considerable skull fracture was also revealed. In the opinion of Dr. Kade, these lacerations of the brain occurred as the result of impact striking the back of the head. The results of an examination of the deceased's blood revealed no evidence of alcohol. All of the above injuries had occurred in the period immediately preceding death. In his opinion, these injuries might conceivably have resulted from a single fall out of a fourth, fifth or sixth-story window, but they could not have occurred from a single fall while deceased was standing on the ground. In order to sustain the described injuries de-

ceased would have to fall once, striking the top of her head; fall again, to get the bruises on the knees; fall once more, striking the back of her head, to get the skull fracture; "just about have to drop on the top of his [her] head," in order to get the broken neck; fall flat on her back, in order to get the back injuries; fall flat forward on her face, in order to get the injuries to the front of the face and the front portion of her body; and would have had to fall once on each side, in order to get the side injuries; unless she was striking a number of different objects in falling, as from a high distance.

In the doctor's opinion, a fractured skull may result from a standing fall, but it would be extremely unlikely for a broken neck to result from a simple fall, and he had never seen any case of strangulation caused by a fall, nor could the injury to deceased's private parts have been caused by a fall—it could only have occurred as the result of a kick; nor could the lacerated brain have been caused by a single shake. Taking all the injuries together, Dr. Kade was of the opinion that they were caused by deceased being held around the neck while lying face upward on the floor, and having her head pounded against the floor, thus fracturing the skull, breaking the neck, and causing the marks of strangulation at the same time.

All of the other injuries found by Dr. Kade, in his opinion, must have occurred immediately, or shortly, preceding death. He concluded that the skull fracture, with resultant hemorrhage about the brain, would have been fatal in itself, as would have been the broken neck, with the resultant injury to the spinal cord. He could form no opinion as to the possibility of the strangulation having been fatal in itself.

Dr. Kade believed that the deceased, after having received the fractured skull with the brain lacerations, would have been rendered unconscious almost immediately and would not have been able to walk any distance. It was his opinion, also, that if a person had the broken neck suffered by deceased she would not have been capable of walking any distance—would have been at least paralyzed, if not dead. It was his opinion that a person would have died within 10 or 15 minutes after having received any one of the fatal injuries.

Persuasive circumstantial evidence was presented, including statements and conduct of defendant after the event, which pointed definitely to him as the perpetrator of a brutal and murderous assault or series of assaults upon decedent.

Defendant's own version of the occurrences preceding the death of the victim, was substantially the following: He

first met deceased in February or March when he and a friend were sitting in his car parked in a lot, having coffee and sandwiches. Suddenly he heard a lot of running and excitement behind some bushes at the end of the lot and saw Margarete coming out of the bushes all disarrayed and scratched up, with several men "plowing" out of the bushes in pursuit of her. She ran out to the street and several cars screeched to a halt trying to avoid her. Then as one car tried to go around her she would step out in front of it. One car stopped just short of killing her. Appellant's companion went to assist her while appellant watched to protect him from the other men. After he and his friend had helped Margarete she claimed she had no place to go and asked appellant to help her. She gave him to understand that she was a prostitute and asked appellant to find her a place to stay. He was living with his mother but also had an apartment at 227 East 52d Street, which he used mainly for the relaxation of his children when he did not want them to disorganize his mother's home. He agreed to let deceased stay at his apartment in return for her taking care of his children. He promised not to interfere with her work, and because she claimed the police were looking for her he agreed never to report her to them. So she moved into appellant's apartment.

At about 11 o'clock on the night of April 4, 1959, appellant and Margarete went to the Avalon Inn on Avalon Boulevard. She went directly to one of the booths and joined some men while appellant went to the bar. Soon she came to the bar and took a bottle of beer from another customer. The bartender asked her not to annoy the customers and to stay with her own party and that the waitress would get beer for her. The waitress refused to serve her because she "had been drinking." While appellant was still at the bar one of the men seated next to decedent arose and made a rude statement. She swore at him and they swore and argued back and forth. She ran over to the bar, snatched a beer from a customer and threw the bottle at the man. He stepped back as though he were going to pull something out of his pocket and the bartender told decedent and appellant to take the discussion outside because the bar was full. While she was in the booth with the said men, "[t]hey were drinking whisky under the table. A fellow on the outside, he must have had about a pint, and they were pouring whisky from under the table, you know, unbeknownst to the bartender—you know, serving it in water glasses, and they was feeding it to

Margaret awfully fast.'' Appellant took deceased out of the bar and some of the men followed them. Deceased was cursing them and people were gathered around staring at her. Then she walked several feet off the pavement onto the grass, stopped, pulled up her dress, exposed her rear and made a vulgar gesture to some of the people. Appellant being embarrassed walked away. She then fell down and scuffled around and tried to get up. Finally she managed it. Then she doubled over and ran into a tree, hitting it with her head, and fell down. She groveled on the ground for several minutes trying to get up. When she got to her feet she ran head first into a car, hitting the door handle, and fell down on the curb with her head partially under the car. Appellant then helped her up and started to walk her down Avalon Street to the apartment. When they reached an alley appellant was suddenly knocked down by several men, two of whom carried Margarete down the alley. For a while one man stood guard over appellant and when he finally got up and started to follow the men they scared him off. He went to a liquor store to call the police but could not get the use of the phone. While there he looked down the alley and heard sounds like something being dragged behind the houses and a can being kicked as if there were a scuffle. He then went to a hamburger stand for a cup of coffee and leaving there headed for his car. On the way he saw deceased lying on the grass in front of a tree by the alley. He assisted in raising her and a person whom he knew as Doug helped him in getting her into his car. He then drove her to his residence, helped her out of the car, and as he turned to close the door she fell down. He then assisted her into the building, during which period she fell several times and stated once, ''I almost broke my neck.'' When he got her inside the apartment she flopped down on the couch and banged her head hard against the wall. She insisted that he not call an ambulance or police. He then left the apartment and she locked the door after him. Appellant then drove around and stopped at several different places, finally returned to the apartment, listened at the door and heard a loud snoring, whereupon he left again. Finally he returned and, the door having been locked from the inside and he having no key, knocked on the door, received no answer, pried open a panel and broke into the room. He observed deceased lying on the floor in the kitchen with her head near the refrigerator. He held her up for a while and later laid her back down again, getting the front of his coat ''messed up'' where he

had held her. Then he put her on the bed, attempted to aid her through the use of ice, milk and coffee, but she told him to let her alone so she could "sleep it off." He contacted Mr. Berry who tried to call an ambulance but appellant interfered and prevented that. Then he went to the home of Mr. Clifford who helped him take deceased to the hospital. Such was the story told by defendant to the jury.

In order to corroborate this story defendant's counsel undertook to prove that decedent's conduct described by defendant was true to a pattern of psychotic behavior which had landed her in the hospital at intervals from 1951 to 1957, suffering from personal injuries and alcoholic psychoses. The trial judge ruled that the proffered evidence (stemming from use of alcohol) was too remote and was calculated to mislead the jury and subject to other good objections advanced by the prosecutor, such as hearsay and conclusions. Counsel for defendant thereupon made a series of offers consisting of hospital records and contemplated testimony of decedent's father, John La Bash.

The records consist largely of "clinical history," exemplified by the following:

"She had been running in the streets early, at 2:00 a.m. She says it sounds real crazy but she suddenly started running, without reason, and goes back to 14 years when she ran away from home. She was a vag; wants to run. Everyone she chooses is wrong by her mother's standard."

"She was found running through the main streets of Alhambra from 2:30 a.m. to—12:30 a.m. to 2:00 o'clock a.m. She was beating her head on the cement floor of Alhambra Police Station. For the protection of patient, she was transported to Unit 3 for observation. The officer states the patient was very violent and had been drinking."

"When the patient was apprehended, she attempted to run in front of a train. At the hospital she became violent and uncontrollable. It is felt that she has an alcoholic psychosis. Parents were contacted. They said she does these things every so often. They would not come to pick her up to take her home but would accept her if she were brought."

"She was acutely disturbed and she was violently disturbed and she was found on railroad tracks, awaiting a coming train."

"On 5/31/55, that after a few drinks she acts violently and bizarrely. She stated that she always has. Otherwise she gets along all right. 'History of emotional'—apparently

—'instability and'—apparently—'immaturity. Realizes she should not drink,' and diagnosis is 'Emotional, unstable personality and pathological intoxication.' "

"And the next is the patient clinical history, dated 8/29, apparently of '53, stating that she had blacked out, and stating that the story was highly unreliable and she was apparently lying."

"Intern notes she had been admitted to the emergency room of Huntington Hospital for convulsions. That she was treated there. And past history reveals the patient had been admitted to Unit No. 3 because of alcoholic intoxication and convulsions. Her psychiatrist confirmed the fact that alcohol ingestion is often followed by convulsion."

"The next one is in-patient record cover. There's no date on it. And they refer to service in jail. It's March 31st. Afterwards has C.A. It says 'H.B.D.,' probably means 'Had been drinking.' 'See doctor's notes. And multiple lacerations, contusions and abrasions, the face, arm and body.' "

"The history says 'She and her husband haven't been getting along well. Went out to look for husband. Said she was taken, on the way home, she was taken by some people she didn't know into an apartment and she tried to escape by jumping through a window. She admits to drinking prior to the injury and she was incoherent, making no sense. Doesn't understand why she's in the hospital or in the jail. And the contusions and hematoma, left forehead, lacerated left cheek, lower left, contusion, possible fractured nose.' "

Manifestly, most of the foregoing matter is hearsay,— statements of decedent or police or others. Of course, these hospital records also contain diagnoses of the patient's then condition,—e.g., "tentative diagnosis of convulsive seizures" —but the plain objective of counsel, as appears from their brief herein, was proof of the fact of occurrences resembling those which defendant claimed to have occurred on April 4 and 5, 1959, just before the victim's death. The diagnoses found in the record would have no tendency to support appellant's story; it was the proof of bizarre behavior such as butting the head on a cement floor, running in front of moving vehicles, butting into objects such as trees and automobiles, —the fact of such conduct that counsel was seeking to prove by hearsay. Counsel said: "If these documents were admitted, your Honor, they would tend—they would prove the whole personality and background of this deceased, which is primarily psychotic, with suicidal episodes, with a number

of self-inflicted injury episodes, with episodes that are similar, at least, in nature to the episode that we are on trial here today, and would tend to prove that her injuries and subsequent death could well have been—could well possibly have been caused by herself or by persons other than the person—or persons other than the defendant because of the fact that she has historically been involved in this type of incident time after time, apparently since she was fourteen years old. It is indicated in the file at least ten or fifteen times during this period of time that she has been involved—at least ten times—she has been involved in this type of episode.''

A series of offers of proof of what Mr. La Bash, the father, would testify was shot through with opinions and hearsay. Appropriate objections were made and sustained.[1]

We do not reach the question that counsel argue primarily, whether the facts relied upon would have been admissible had they been competently proved.

Appellant's reliance upon section 1953f, Code of Civil Procedure[2] cannot enable him to prevail upon this issue. ■■ *Hoel v. City of Los Angeles,* 136 Cal.App.2d 295, 309 [288 P.2d 989] : "Not all official reports and not all business records are made competent by the cited sections of the code. Essentially accident reports, especially those compiled by police at the scene of an accident—based on statements of participants, bystanders, measurements, deductions and conclusions of their own—fail to qualify as admissible official records or business records. . . . ■ In *McGowan v. City of Los Angeles,* 100 Cal.App.2d 386, 392 [223 P.2d 862, 21 A.L.R.2d 1206], this court said: 'The statute does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of an *admissible* ''act, condition or event.'' It does not make the record admissible when oral testimony of the same facts would be inadmissible.' ''

*People v. Terrell,* 138 Cal.App.2d 35, 57 [291 P.2d 155] : ''We do not wish to be understood, however, as approving the ruling of the trial court admitting into evidence the

---

[1]Defendant's offers were finally reduced to written form as found at reporter's transcript, pages 1099-1108.

[2]Code Civ. Proc., § 1953f: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

notation in the hospital record 'Diagnosis (1) prob. criminal abortion.' The trial court should have sustained the appellant's objection to this evidence for two reasons. In the first place, it constituted a conclusion to which the doctor who made the notation could not have testified to if called as a witness. . . . In the second place, an opinion is not one of the matters the record of which may be received in evidence under section 1953f, Code of Civil Procedure. In order for a record to be competent evidence under that section it must be a record of an act, condition or event; a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion; it may or may not be founded upon sound reason; the person who has formed the conclusion recorded may or may not be qualified to form it and testify to it. Whether the conclusion is based upon observation of an act, condition or event or upon sound reason or whether the person forming it is qualified to form it and testify to it can only be established by the examination of that party under oath. In the ordinary affairs of life men act upon records of acts, conditions or events made in the ordinary course of business and this fact and the fact that the rules of evidence had surrounded the use of such records, as evidence, with so many technicalities and hair-splitting refinements, led to the formulation and the adoption, by many of the states, of the 'Uniform Business Records as Evidence Act' but these reasons do not apply to the record of a conclusion which in reality but reflects the state of mind of the person expressing the conclusion. It is true that some diagnoses are a statement of a fact or condition, for example, a diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors.''

█ It should be remembered that a history given by a patient to his physician is admissible only as a basis for the expert opinion of the latter and never as substantive proof of the facts so stated to him by the patient. (*Willoughby* v. *Zylstra*, 5 Cal.App.2d 297, 300 [42 P.2d 685] ; *People* v. *Brown*, 49 Cal.2d 577, 585 [320 P.2d 5] ; Witkin on California Evidence, § 264, p. 301.) The same rule necessarily is applicable to such statements found in a hospital record when offered as affirmative proof of their truth.

*People* v. *Bray*, 42 Cal.App. 465, 470 [183 P. 712], though

not dealing with this exact question, is persuasive. That was a prosecution for homicide in which defendant contended that influenza was the cause of death. He called a witness to testify that the deceased, five days before the event, stated that "she had been delirious and had had fever." It was held that this was properly excluded, the court stating, page 470: "To be competent as evidence, the declarations must exclude the idea of a narrative of past occurrences. Hence, declarations or complaints by one in his last illness that are but a narrative of the causes of the sickness or injury, or the manner in which or the time at which the injury was inflicted, or the nature of past symptoms, or the bodily condition at a prior time, are incompetent and inadmissible."

A discussion of hospital records as evidence in 14 Southern California Law Review, at page 106, contains this: "A further question arises out of the scope of the data recorded in the hospital. It may cover matters lying outside the personal knowledge of the doctor or any of the attendants but reported to an attendant by the patient or by someone on his behalf. This information includes date of birth, occupation, nationality, religion, the patient's statements of reasons, signs and symptoms for seeking medical aid, the patient's story of the onset, together with subjective signs and symptoms of diseases or injuries up to the day of admission, including a statement of treatment given, a summary of the patient's life in relation to pathology, illness, with or without complications, operations and injuries, habits, social conditions, environment, and any data which may be related to the present illness, family history relative to evidence of hereditary or infectious diseases and familial tendencies to disease. Within the traditional hearsay framework little basis can be found for the inclusion of data which lies outside the personal knowledge of the doctor and others who are employed by, and acting on behalf of, the hospital. Most of the assertions of the patient would, as such, fail to meet the requirements of admissible hearsay. Some of the statements might, however, fall within such hearsay exceptions as admissions, or pedigree." (See also *Behr* v. *County of Santa Cruz,* 172 Cal.App.2d 697, 704 [342 P.2d 987]; *People* v. *Gorgol,* 122 Cal.App.2d 281, 300-301 [265 P.2d 69]; anno. in 44 A.L.R.2d 553, at 559 and 563.)

We have concluded that the court did not err in excluding the evidence just discussed.

There is no merit in the contention that error was committed through receipt into evidence of photographs of

decedent's nude body and permitting them to go to the jury room. They prove more persuasively than the technical language of the autopsy surgeon what happened to the victim. Their evidentiary value clearly outweighed any inflammatory quality they may have had. Hence there was no abuse of discretion in receiving them in evidence. (See *People* v. *Cheary*, 48 Cal.2d 301, 312 [309 P.2d 431]; *People* v. *Burwell*, 44 Cal.2d 16, 34 [279 P.2d 744]; *People* v. *Burkhart*, 211 Cal. 726, 732 [297 P. 11].) Having been thus received it was proper under section 1137, Penal Code, and in the exercise of sound judicial discretion (*People* v. *Walker*, 150 Cal.App.2d 594, 603 [310 P.2d 110]) to send them to the jury room. (*People* v. *Balestieri*, 23 Cal.App. 708, 712 [139 P. 821].)

Appellant's contention that "the court erred in permitting questions and answers to rehabilitate the witness James Rowell" is somewhat obscure in its development. Examination of the pertinent portions of the record fails to reveal any error in this regard.

Counsel complains of the propounding of a leading and suggestive question by the Deputy District Attorney directed to his own witness. There is no substance to this contention.

■ A certain note written upon an envelope and addressed to defendant was received in evidence and may have reflected a motive for the murder. It is now argued that there was no proof that decedent wrote it, but the record shows that her father testified that same was in her handwriting. There is no merit in this claim of error.

■ Appellant's counsel says: "That throughout the trial, the District Attorney constantly referred to statements or arguments of the defense counsel as being calculated to deceive and confuse the jury." That is the whole of the argument upon the claim of prejudicial misconduct of the prosecutor. It is accompanied, however, by a citation of certain transcript references examination of which discloses only such asperity as often develops between counsel engaged in a long trial. No objection or motion was made in the cited instances and thus any objection was waived. (Fricke on California Criminal Procedure, 5th ed., p. 463.)

■ A blood test made upon decedent and showing absence of alcohol in her system was received over objection of defense counsel. The making of such tests and their receipt in evidence is a recognized procedure (19 Cal.Jur.2d, § 347, pp. 78-79), and appellant's objection is confined to lack of foundation. It appears, however, that the report of the blood

test qualified as a business record and was admissible under section 1953f, Code of Civil Procedure.

At the trial defense counsel moved that he be given an opportunity to examine the reports made by police officers concerning this case, also any written reports the district attorney might have in his file as to alleged statements made by defendant to the police. After some discussion and clarification of the scope of the request the court ruled as disclosed by the following colloquy: "MR. SIMMONS: Let's say my first request, your Honor, is any statement that the defendant purportedly made to the police officers or any notes or memorandums that the police officers took in respect to alleged statements of the defendant. . . . THE COURT: First, as to statements made by the defendant to the Police Department, you are entitled to —— MR. PACHTMAN: Yes. THE COURT: Now, what is your second one? MR. SIMMONS: Any notes or memorandum made by the police officers on any alleged statements made by the defendant. . . . MR. PACHTMAN: . . . I will concede that I have some such statements and that I will be more than happy to let counsel have those, or view those statements, because I don't have —— THE COURT: In other words, if they didn't take down word for word what he said and they made a statement of their understanding of what he said, that's what you want? MR. SIMMONS: That's right. THE COURT: Well, you are entitled to that." Police Officer Campbell testified to a conversation with defendant on the afternoon of April 5, 1959, in which he said decedent was lying on the street at 55th and Central at about 9 a.m. of April 5th, that he picked her up, took her to a friend's house, tried to revive her and failing in that brought her to the hospital. On cross-examination it developed that the officer had made notes of the conversation which were not in court with him. Thereupon defense counsel moved to strike the testimony of the officer. "MR. SIMMONS: Strike the whole testimony, because we had made a motion and I had understood that we had been given all copies of all alleged statements of the defendant. Now we find there's another statement here. I think that ——." The following colloquy then ensued: "MR. PACHTMAN: Well, Counsel enumerated the statements that he wanted; but I didn't even know about this statement. THE COURT: Well, have you got it in your file? MR. PACHTMAN: I didn't have this statement in my file. THE COURT: That's what he demanded, the copies of the file. MR. SIMMONS: I wanted copies of all statements made by the defendant, your Honor. I think that was the motion. THE COURT: Where did you make

this motion? Before whom? Me? MR. SIMMONS: I hope so, your Honor. THE COURT: I don't remember that kind of motion. Your motion, as I considered it, was that the District Attorney made a remark that you were entitled to anything in the files that applied to the defendant's side of the case; and the Court asked the District Attorney—requested the District Attorney to deliver it to you, and you specified what you wanted after he specified what he had. Nothing said about the Police Department delivering anything to you. Objection overruled. Consider your motion made to strike out all of his testimony, and the motion is denied." This ruling is now challenged as error. The deputy district attorney's assertion that he had no such statement in his file and had never heard of it is not questioned or denied. There is nothing to indicate a deliberate suppression, and at most the record shows a misunderstanding as to the scope of the court's original order. No request for an immediate delivery of the notes to defendant or a continuance for the purpose of examining the same was made. In these circumstances failure to furnish a copy of the officer's notes to defendant did not work a miscarriage of justice.

We find no prejudicial error.

The judgment and order are affirmed.

Fox, P. J., and Herndon, J., concurred.