[Civ. No. 20056. First Dist., Div. Three. Feb. 26, 1963.]

PAUL HUTTON, a Minor, etc., et al., Plaintiffs and Appellants, v. BROOKSIDE HOSPITAL et al., Defendants and Respondents.

Jack H. Werchick for Plaintiffs and Appellants.

Joseph F. Rankin, Clark, Heafey & Martin, Gerald P. Martin, Joseph F. Rankin, Peart, Baraty & Hassard, Salvatore Bossio and Richard G. Logan for Defendants and Respondents.

DEVINE, J.—In this action for wrongful death because of alleged medical malpractice, appellants, plaintiffs, concede that there is sufficient evidence to support the verdict for defendant physicians (the hospital was released by judgment of dismissal on demurrer, and no appeal was taken), but contend that the case was a close one and that certain procedural errors caused a miscarriage of justice. The claimed errors are: (1) coercion of verdict and refusal by the judge to have requested testimony read to the jury; (2) erroneous refusal to admit a business record in evidence; and (3) error in striking affidavits of jurors at motion for new trial and abuse of discretion in denying motion for new trial.

Because the alleged errors are procedural ones, the statement of facts herein need but give an outline of the case at large; more particular references are made to the facts relevant to the asserted errors.

## General Outline of Facts of the Case

On October 30, 1958, plaintiffs' father, herein called decedent, was injured by being struck by assailants, and on November 10, 1958, he died. Meanwhile, he had been seen by the three physicians who are the respondents. The first doctor had never seen decedent until be was brought into Brookside Hospital as an emergency patient. He had been found by the police walking about in a dazed condition. The visible signs of injury were a black eye and a bruise on his forehead. The doctor gave decedent a general examination, gave him a tetanus injection and told him to contact his personal physician. He was taken home in a police automobile. The claimed negligence of the first doctor is this: that he did not call decedent's personal physician and tell him how the man had received his injuries; the significance of this claim appears below in discussing the second physician. Since only the first asserted procedural error, under the enumeration given above (which must be considered as to all three respondents), could apply to this respondent, no more need be said about the case against him.

The second doctor was decedent's personal physician, whom decedent called upon two days after his injury. He took X-rays of decedent's skull and found no fracture. Decedent did not tell his own physician that he had been assaulted, but said that he had been in an automobile accident and had hit his head against the windshield. The doctor prescribed 12 percodan tablets, a codeine derivative, and rest. Three days later decedent returned and was given 12 more percodan tablets and 60 fiorinal tablets (used for treatment of tension headaches). After another three days decedent was given an injection of high potency vitamin for his headaches. Decedent had long suffered from an emotional difficulty, and the doctor testified that he believed the tension headaches were a result of this. The following day the doctor examined decedent at home and diagnosed his glassy-eyed condition as being due to having taken an overdose of fiorinal. Decedent had told the doctor that he had popped the 60 fiorinal tablets into his mouth like candy. The following day Mrs. Hutton was unable to rouse her husband, the doctor was called and he advised taking decedent to Brookside Hospital in an ambulance, and this was done. The asserted negligence of this second doctor is failure to diagnose the injury properly and to provide appropriate treatment. At this point we revert to the point made against the first doctor, which is that the second

doctor testified that if he had known the cause of decedent's injury (by communication from the first doctor, which would have contradicted the report made by the patient himself to the second doctor), and had known that the man had been unconscious or dazed or confused, he, the second doctor, would have been warned of the possibility of brain damage.

At Brookside Hospital decedent, who was then unconscious and in a coma, was met by a third doctor, who had never seen him before. This doctor decided that the man should be transferred to the county hospital at Martinez for neurosurgical treatment. The doctor placed an airway in decedent's mouth, in order to prevent choking. It would have been possible to have a neurosurgeon come to Brookside but this would have taken from one to three hours and the doctor decided that more immediate surgery was needed. The claimed negligence of the third doctor is the transporting of the patient in his comatose condition, it being one premise of plaintiffs' case that a cause of the death, though not the sole cause, was collapse of the lungs caused by aspiration pneumonia, which in turn was caused by inhalation of secretions while the patient was unconscious.

### Facts and Decision Relating to Claimed Impropriety in Rendition of the Verdict

The jury, having retired to deliberate at 4 p.m., returned at 10 p.m. to report that although agreement had been reached as to one of the defendants, the votes otherwise stood seven to five; however, six of the jurors believed that the case could be concluded, and the court directed further deliberation. Shortly after midnight, the jury reported that it was in agreement as to two of the defendants, but still stood seven to five as to the third. One of the jurors asked that some of the evidence "be gone over again," and the judge replied that if the jury wished to have anything read, they would have to let him know what it was. Another juror responded that the jury should go back and discuss what particular things they needed, and the judge acquiesced. The court asked for a show of hands and stated that about ten of the jurors believed they should continue to try for a verdict. One juror asked if it was justifiable to change a vote in order to arrive at a verdict, and the court said that it was not, unless the juror was convinced. When the jury had retired, the court and counsel searched the law to find if it would be permissible to allow the jury to separate, against the opposition of one of the de-

fense lawyers. While they were engaged in this research, at 1:15 a.m. the jury returned with its verdict in favor of all three respondents. A minor incident under this heading, because appellants contend it is connected with the subject matter, is this: at one time during the trial, the court, having observed that one of the jurors was taking notes, told her that the practice was not favored, that there is an official record of everything that occurs, and that one attempting to write might miss something going on; but the judge told the juror that she had a right to take notes.

██ ██ We reject the claim that the verdict was coerced or that the jury was deprived of desired information. The request for additional time came from the jurors themselves, and the judge did not say a word about the desirability of reaching a verdict. Although some mention was made about having testimony read, the jury, when invited by the judge to point out the desired parts, did not do so, but after more deliberation returned its verdict. If any juror changed his vote merely in order to arrive at a verdict, he did so in violation not only of the usual instruction (BAJI No. 7), which was given in the charge, but also in violation of a specific admonition made by the court when the jury appeared for the last time before rendering the verdict. The jury may have been, as appellants argue it was, discommoded by the lateness of the hour, but the jury did not protest and the trial judge was in the best position to decide this, both at the time of trial and on motion for new trial. As to the minor point relating to the juror's taking of notes, it is to be observed that the court told the juror that she was within her rights in doing this, and the caution may have been intended to inform the whole jury that the reporter's notes are the official notes, and that the reading of them may be called for by the jury.

*Facts and Decision Pertaining to Refusal to Admit a Report into Evidence*

The subject matter of this heading relates solely to the third doctor, who caused decedent to be transported from Brookside Hospital to Martinez County Hospital. ██ Appellants' counsel offered in evidence a paper called "Record of Unusual Occurrence," signed by a nurse whose title was "Evening Director" at Brookside. It was offered as a business record under the Uniform Business Records As Evidence Act (Code Civ. Proc., §§ 1953e-1953h). All of the important facts stated in the document were the subject of other

evidence which was admitted except one, namely, the opinion of the registered nurse that the patient "seemed too ill to be moved."

We deem it unnecessary to decide whether this document, in its general form and manner of preparation, constitutes a business record, because, assuming that it did, all of the contents of it were covered by other evidence which was admitted, except one part which was clearly objectionable. This one part is an opinion by the registered nurse, namely, that the patient "seemed too ill to be moved." The Business Records As Evidence Act does not make admissible that which would be inadmissible if it were presented by oral testimony. (*People* v. *Williams,* 187 Cal.App.2d 355, 364 [9 Cal.Rptr. 722] ; *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386, 392 [223 P.2d 862, 21 A.L.R.2d 1206].) The question whether the patient was too ill to be moved was not one upon which the nurse was qualified to give an opinion (*MacCoy* v. *Gage,* 38 Cal.App. 672, 675 [177 P. 296]), and this is particularly so where a decision relating to the immediacy of surgery had to be made. Moreover, even if the witness had been qualified, her opinion would not constitute a record of an act, condition or event within the meaning of section 1953f of the Code of Civil Procedure, but was a conclusion and could not be presented except by testimony subject to cross-examination. (*People* v. *Williams, supra,* at p. 364; *People* v. *Terrell,* 138 Cal.App.2d 35, 57 [291 P.2d 155].)

### Facts and Decisions Pertaining to an Item of Evidence and Jurors' Affidavits

During the trial one of counsel for the defense asked plaintiffs' counsel to produce a bottle containing percodan tablets which had not been consumed by the deceased, and counsel complied. The bottle thereupon was admitted into evidence as a defense exhibit. During recess one of defense counsel, who had been examining the bottle, inadvertently, according to his affidavit, put the bottle into his pocket and at recess time walked out of the courtroom with it; another of defense counsel was with him during all of this brief period. About two minutes later, the bailiff appeared in the corridor asking if counsel had taken the exhibit and counsel removed it from his pocket, and it was returned to the courtroom. In the course of his argument to the jury, another of defense counsel counted out the number of remaining percodan tablets from the bottle—10 in number—and

apparently argued to the jury that decedent's headache could not have been very bad at the time of his third visit to the second doctor (we say "apparently" because the arguments are not in the transcript). Counsel for plaintiffs reported to the court during the course of the arguments, and again while the jury was out, that the bottle, when it was in his possession, contained not more than four tablets, and he asked that the pills be analyzed because he said he had received information that by analysis it might be shown that the pills presently in the bottle were of a different date than that at the time the prescription was filled. Counsel did not ask for a mistrial, however, and did not ask that the case be reopened. The court granted the request for the analysis, but what came of it does not appear in the record.

Upon motion for new trial, counsel for plaintiffs produced six affidavits, including those of persons connected with his office and that of one of the plaintiffs, all to the effect that there were four, or about four, pills in the bottle at or before the time of trial. He also presented affidavits of three jurors in which reference was made to the number of pills in the bottle, but these affidavits also contained material which would have impeached the verdict of the jury. Two of the jurors gave it as their opinion or observation that there were but three or four pills in the bottle when it was first seen in the courtroom, and one of the jurors that there "appeared to be more pills" at the second showing in the courtroom. The court struck these affidavits. There were counteraffidavits by all defense counsel, and, in particular, the two attorneys who had been present during the short time when the bottle was absent from the courtroom made affidavit that nothing whatever was done to alter the contents. At the hearing on motion for new trial, the judge said that he had confidence in all counsel in the case and he was certain that defense counsel did nothing as far as the pills were concerned; that he himself could not see when the bottle, which he recalled to be of a dark sort, was held up.

There are several reasons why this point must be decided against appellants. In the first place, there is nothing to show us that the number of pills in the bottle was such a weighty element in the case that error in regard to this element would have been prejudicial. Nevertheless, had the court deemed it likely that evidence had been tampered with, even on an element that was not crucial, it is very likely that a new trial would have been granted, and it is well to state

grounds in addition to lack of prejudice which prevent reversal. The first is the very positive expression of the trial judge that he was certain that nothing improper had been done, a statement which we are sure would have been made even if the jurors' affidavits had been admitted in evidence. These affidavits were merely cumulative to the ones actually admitted on behalf of appellants. The conclusion is inescapable that even if the jurors' affidavits had been admitted, the court would not have regarded it possible that counsel would have engaged in a practice so dishonorable and so fraught with grave consequences as to have tampered with the evidence. Besides, assuming that the statements of the jurors relating to what they had seen in the courtroom are admissible, not as matter impeaching their verdict but as statements of facts occurring in the courtroom, these statements were inextricably mixed with declarations which did attempt to impeach the verdict. Such declarations are inadmissible. (*Sopp* v. *Smith*, 59 Cal.2d 12 [27 Cal.Rptr. 593, 377 P.2d 649]; *Kollert* v. *Cundiff*, 50 Cal.2d 768, 772 [329 P.2d 897].) Where an offer of evidence includes several different matters, some of which are vulnerable to objection, the entire offer may be rejected. (*Eaton* v. *Brock*, 124 Cal.App.2d 10, 16 [268 P.2d 58].)

Judgment and order granting motion to strike jurors' affidavits affirmed.

Draper, P. J., and Salsman, J., concurred.

Appellants' petition for a rehearing was denied March 26, 1963, and the following opinion was then rendered:

THE COURT.—Appellants have asked us to consider a recent case, which was mentioned at oral argument but not in the briefs, namely, *Smith* v. *Shankman*, 208 Cal.App.2d 177 [25 Cal.Rptr. 195], on two points: (1) the fact that testimony was not read to the jury, and (2) certain instructions. We believe the case is quite distinguishable from the one before us on both points: (1) In the *Shankman* case the bailiff had taken it upon himself to reply to the jury foreman's request for transcript that the jury could not have it. In the case before us the reporter's transcript shows that two jurors asked the judge for some of the evidence and that the judge informed the jury that any particular part could be read, but they could not receive the testimony indiscriminately; and that a

juror suggested that the jury go back to discuss what they needed. Thereupon the court, sending the jury back, repeated that if there was any particular thing needed in the testimony, it would be read. There are references by court and counsel, in the proceedings on motion for new trial, to a request by one or more jurors to have the testimony of one of the doctors read, but the reporter's transcript contains no more than is stated above. In any event, the invitation of the judge to have particular parts of testimony read was given to the jury. (2) In the *Shankman* case it was held error to have instructed the jury that physicians are not bound to use any particular method of treatment and if an approved method is chosen, it is not negligence, even if it turns out later to have been a wrong selection, where the physician did not treat the patient's true condition, tubal pregnancy, at all because he had failed to diagnose the condition. This, appellants argue, was the case here, too, because the actual cause of death, edema of the brain, was not diagnosed or treated, and the same instruction was given.

In the *Shankman* case an accumulation of errors and an array of defense-oriented instructions, rather than an instruction standing alone, compelled reversal. Moreover, in the case before us, there was testimony by a physician called as an expert witness, Dr. Degnan, who, in answer to a hypothetical question relating to standard practice in the *care and treatment* of the patient by the family physician, replied that the standard practice had been followed. Plaintiffs themselves offered and received an instruction that it is negligence for a doctor to undertake *treatment* of a patient if a reasonably careful general practitioner would decline treatment in favor of a specialist. Actually, treatment was given for headaches and emotional problems by the second physician. Unlike the tubal pregnancy in the *Shankman* case, which had been present from the beginning of the doctor's services and undiagnosed, the edema of the brain from which Mr. Hutton died may have come later, according to testimony of the Medical Director of Contra Costa County. Three separate instructions (Nos. 20, 21, 22) were given, as requested by plaintiffs, on the duties of physicians in respect of diagnosis.

Petition for rehearing denied.

Appellants' petition for a hearing by the Supreme Court was denied April 24, 1963.