SHINN, J.
 
 *
 

 Plaintiff Rosener appeals from a judgment on verdict against Merle E. Larson and Ray P. Sanchez in the amount of $2,250 as damages suffered in an accident caused by the negligent operation of a truck. Named as defendants were Larson and Sanchez, owners and operators of the truck, and certain others, against Avhom no judgment was rendered.
 

 The sole ground of appeal is inadequacy of the award of damages. Plaintiff alleged and sought to prove that the injuries he sustained in the accident on June 27, 1962, were the cause of a massive and disabling stroke he suffered January 19, 1963. Defendants denied that the later condition of plaintiff was due to the accident and alleged that it was the natural outgrowth of an illness from which plaintiff suffered at the time of the accident. There was no dispute as to the circumstances of the accident. The trial developed into a conflict betAveen the opinions of the medical experts who testified for plaintiff and the opinions of defendants’ expert witnesses. The points on the appeal are claims of error in rulings with respect to receipt of the testimony of the expert witnesses. We have concluded that while the court’s rulings were not correct in all respects, there was no error which affected the conclusions of the jury, and that the judgment should be affirmed.
 

 The accident was described by plaintiff. June 27, 1962, he was a partner in a restaurant on Sunset Boulevard in HollyAvood Avhere he served as cook; a truck came doAvn an intersecting street, failed to stop at Sunset, crossed the street and crashed into the restaurant, causing extensive damage to the premises and" injuring plaintiff and five other persons. Plaintiff was knocked to the ground and lay under some heavy planks; he freed himself from the planks; he received cuts on his forehead, on an elbow, an ear, and sustained bruises; he felt pain in one leg. After about 30 minutes plaintiff was
 
 *869
 
 taken by ambulance to Citizens Emergency Hospital where his cuts were sutured; he remained in the hospital two hours, when he returned to the restaurant and from there was taken home; an appointment for the following day was made with plaintiff’s regular physician, Doctor Holder; the appointment was kept; plaintiff was given lamp treatments, aspirin and sleeping pills; he had no pain but there was a numbness in his left leg. A week or ten days later plaintiff developed a numbness in his right hand and could not use it. Doctor Holder eventually removed the stitches and plaintiff continued under the care of Doctor Holder until in September 1962; thereafter he continued with his work and had no treatment, but took steam baths.
 

 January 19, 1963, plaintiff suffered a stroke which created a permanent condition of total disability; he obtained the services of Doctor Ballard and remained under Doctor Ballard’s care.
 

 Although the testimony of the expert witnesses was given at great length a comparatively brief statement of it will suffice for a consideration of the claims of error.
 

 On behalf of plaintiff Doctor William Riley Ballard, Jr., testified he was a friend of plaintiff; regularly patronized plaintiff’s restaurant and went with him to ball games. He saw plaintiff a couple of weeks after the auto accident and noticed that he sometimes held his neck with his right hand and walked off balance; he saw plaintiff frequently before January 1963 and plaintiff’s condition of walking off balance persisted. January 19, 1963, he was called to plaintiff’s home; he obtained plaintiff’s history, made an examination and formed the opinion that plaintiff was suffering from an atypical thrombosis; he called Doctor Orr, a neurologist, and consulted with him; at his request Doctor Orr examined plaintiff at the Daniel Freeman Hospital and made a report which was made a part of the records of the hospital. Doctor Ballard made inquiry of Doctor Holder and considered plaintiff’s history he obtained from the doctor. He got most of his information from Doctor Holder, but got the history from both the doctor and plaintiff. He testified to the opinion that in the auto accident plaintiff suffered a severe cervical sprain and damage to cervical arteries which progressed until a spasm or thrombosis occurred cutting off the blood supply to the brain and causing the condition which was later manifested.
 

 Doctor Emil Seletz testified that he examined plaintiff first August 27, 1964; he took plaintiff’s history; it was his opinion
 
 *870
 
 that in the auto accident plaintiff suffered a sprain of the cervical spine, also a concussion of the brain, a disturbance of the blood supply to the brain stem, which produced the conditions that developed early in 1963.
 

 Lloyd Spaine testified he had occupied an apartment with plaintiff; he had worked in plaintiff’s restaurant; he saw plaintiff daily; they had opened up a hamburger place in the block next to the restaurant; after the accident of June 27th he saw plaintiff frequently; plaintiff was dragging his feet; about 10 minutes after the accident plaintiff talked as if he had a mouth full of mush; he talked with a twang; his condition got worse.
 

 Plaintiff’s expert witnesses gave ample reasons for their opinions that the auto accident was the cause of the permanent disability. Had the jury given full credit to those opinions, a conclusion that plaintiff’s permanent injuries were caused by the accident would have been required, and a verdict for $2,250 would have been grossly inadequate. The parties understand that the verdict represents the judgment of the jury that the auto accident caused only minor injuries, and that plaintiff recovered from the same.
 

 Plaintiff testified that on May 7, 1962, he Avas Avorking in temperatures of 110 to 120 degrees until 11 a.m.; his legs gave out and became rubber-like; he sat down and then tried to go back to work but the same thing happened again; he Avas taken to an emergency hospital where he remained two hours; an appointment was made with Doctor Holder for the following day; the appointment was kept; plaintiff Avas placed in the Culver City Hospital where he remained two and a half or three days; he went back to Avork; he Avorked regular hours thereafter; he worked only short hours after the June 27, 1962, accident and had not worked since March 31,1964.
 

 Doctor Holder, called by defendants, testified he made reports of his services for plaintiff after the May 7th occurrence and after the June 27th auto accident. These reports were made a part of the records of the Culver City Hospital, Avhich were produced at the trial.
 

 Doctor Holder testified that after the auto accident he removed the stitches for plaintiff; by July 12th plaintiff had fully recovered from the auto accident except for some small sears, and plaintiff remained in his care until September 12, 1962. His record of plaintiff’s condition contained no mention of any complaint to the cervical spine area. Plaintiff had consulted him February 2, 1962, complaining of fatigue, dizzi
 
 *871
 
 ness and burning in the chest; he was about 40 pounds overweight; he said he had been drinking 15 to 20 cups of coffee and smoking two and a half to three packs of cigarettes a day. Plaintiff had a volatile personality and was one who “blows top many times.” He diagnosed plaintiff as one who was suffering from essential hypertension (high blood pressure). Plaintiff had elevated cholesterol, an abnormal electrocardiogram (indicating high blood pressure for some time), albumin in the urine and blood cells in the kidneys, indicating some damage from elevated blood pressure; and he also suffered from headaches. There was a history of dizziness, fatigue, difficulty in breathing and certain symptoms from foods like pastry, coffee and cigarettes. The doctor formed the opinion while plaintiff was in the Culver City Hospital that “something had taken place in the head, such as an obstruction or spasm of a blood vessel, to cause a situation like this. ... It may be the blocking of a blood vessel by a clot.” Doctor Holder noted on his record as his diagnosis that plaintiff had a left cerebral vascular accident; he expressed that opinion in his direct examination, and that such condition involves pathology in the brain, producing the symptoms that were described ; he would say that the cerebral vascular accident was mild. The doctor advised plaintiff that he had had an interference with circulation of one of the blood vessels in the head and that this might happen again. Doctor Holder testified that in his opinion there was no connection in the realm of reasonable medical probability between the auto accident and the condition which developed in January 1963. His reasons were the lapse of time and the circumstances of the examination at the time of the first incident as compared with the findings at the time of the second incident.
 

 Doctor Bercel examined plaintiff in 1965. He obtained a history from plaintiff; he reviewed the medical records and he testified he did not believe that the June 1962, accident contributed to the cerebral incident in January 1963. He was of the opinion that any slurring of speech or dragging of the leg or a sense of imbalance would not be connected with the June 27, 1962, accident. His opinion as to the cause of the January 1963 stroke was stated, in part, as follows: “. . .if we would take out completely the accident of June 1962 and just review the medical history of this individual between February 1962 and January 1963 it would be that of a typical cáse of essential hypertension in an individual aged in his early forties, who has consistently high blood pressure, par
 
 *872
 
 ticularly diastolic, as a result of which there are the usual and unavoidable vascular changes which eventually culminate in a stroke and therefore this is a typical, consistent, common, everyday, garden variety of a stroke occurring in such an individual.”
 

 Doctor LaJoie, a defense witness, testified to his opinion that plaintiff experienced a “very mild cerebral hemorrhage” May 7, 1962, and there was no relationship between the accident in June 1962 and the stroke which occurred in January 1963.
 

 In the cross-examination of Doctor Ballard it was developed that he had read the Culver City Hospital record which related to the May 7th incident. A question arose whether the report had been altered with respect to a notation of blood pressure. Without objection, a portion of the report was read aloud after the court had stated to the jury that it was being used only to enable the jury to examine the claimed alteration. The following was read from the record: “ ‘42-year-old W/M—’ evidently an abbreviation for white male—-‘who suddenly became dizzy while cooking in restaurant, became progressively weak and was unable to stand or use left hand with usual ability. He was taken to emergency hospital where doctor observed BP—’ evidently an abbreviation for blood pressure—and this originally read 115 over 106, changed to 185 over 106.”
 

 i i
 

 “ ‘42-year-old W/M—’ standing for white male—‘who suddenly became dizzy while working as a cook today and then was unable to stand, walk or use the left hand. He was taken to an emergency hospital where BP was reported as 185 over 106.’ ”
 

 On cross-examination Doctor Ballard testified that he did not see the Culver City Hospital records until late in 1963 or early in 1964. At that time he was shown a copy by an attorney who was then representing plaintiff. He considered the records in forming an opinion as to plaintiff’s condition on May 7th. It was his opinion that plaintiff then suffered from a possible salt deficiency syndrome.
 

 The doctor testified on cross-examination that before he read the Culver City Hospital report he testified, in another matter in which plaintiff was interested, that plaintiff had suffered a stroke in 1962, but that was because Doctor Holder told him; that plaintiff had had a stroke in 1962; after he examined the Culver City Hospital records he believed plaintiff had not
 
 *873
 
 suffered a stroke. Plaintiff testified he did not tell Doctor Ballard that he had had three strokes in one day and was then okay. Doctor Ballard testified he did not believe plaintiff told him he had had three strokes.
 

 The first point to be considered is the claim that improper use was made of a portion of Doctor Orr’s report. This report contained plaintiff’s history as recorded by Doctor Orr; it stated, in part, “ ‘2/20/63. Findings, W/D, W/N, W/M of 43 years with history of hjrpertension and 3 (underlined) small strokes all at short intervals (some hours) in April, ’62. According to the patient, who seems to be a reliable informant these ‘strokes’ were all on the left.’ ”
 

 Defendants offered the Daniel Freeman Hospital records which contained the report; objection was made that Doctor Orr’s report was not a part of the hospital records although contained in them; Doctor Orr was not an employee of the hospital; his report was a private record, was hearsay, and inadmissible as a business record of the hospital, and could not be used to impeach plaintiff.
 

 The court ruled that the record could not be used as evidence of the facts stated therein but only as impeachment of the witness and his diagnosis, opinion and prognosis and that it was admissible if the doctor used it in forming his diagnosis. Doctor Ballard was then shown the record and stated that he had read it and had placed his signature on it to show he had read it. He identified it as the report of Doctor Orr, stated he had considered it, that he considered it in forming his opinion whether plaintiff had suffered three small strokes in April 1962 and that he probably considered it in recalling whether Rosener had given him a history of three small strokes. The court then ruled that the portion of the report which contained the statement of plaintiff that he had suffered three strokes in April 1962 was admissible, and instructed the jury that the portion about to be read was received “only as the foundational matters upon which this doctor based his diagnosis and opinions, and it is not evidence of the truth of the matters asserted therein.’’ Thereupon the statement was read in evidence.
 

 Plaintiff argues that the report was not within any exception to the hearsay rule and also that it purported to state the opinion of a layman which he was not qualified to express. We do not find either of these arguments to be tenable.
 

 In support of his contentions appellant cites
 
 People
 
 v.
 
 Terrell,
 
 138 Cal.App.2d 35 [291 P.2d 155],
 
 People
 
 v.
 
 Williams,
 
 
 *874
 
 187 Cal.App.2d 355 [9 Cal.Rptr. 722], and
 
 Hutton
 
 v.
 
 Brookside Hospital,
 
 213 Cal.App.2d 350 [28 Cal.Rptr. 774, 29 Cal.Rptr. 670], These eases do not aid plaintiff. Bach ease involved the nse or attempted use of hospital records as proof of the facts stated therein. In
 
 Terrell (supra,
 
 138 Cal.App.2d at p. 57), the questioned entry was “Diagnosis (1) prob. criminal abortion”; in
 
 Williams (supra,
 
 187 Cal.App.2d at p. 363), the entries related “bizarre behavior such as butting the head on a cement floor, running in front of moving vehicles, butting into objects such as trees and automobiles,” all facts, the court said, which counsel was attempting to prove by hearsay.
 

 No part of the records involved in those cases was offered as a part of the history obtained by a doctor from the patient and used in arriving at his diagnosis.
 

 The argument of appellant is the very one as to which the trial court agreed with him. The hospital records were not to be considered as evidence of facts stated but were received in evidence as matter which the doctor made use of as a basis for his diagnosis.
 

 It is well settled that properly authenticated hospital records may be received in evidence insofar as they record personal observations of the attending physician or pertinent statements of the patient’s history which the physician has made use of in reaching his professional opinions.
 
 (People
 
 v.
 
 Gorgol,
 
 122 Cal.App.2d 281 [265 P.2d 69];
 
 People
 
 v.
 
 Brown,
 
 49 Cal.2d 577 [320 P.2d 5];
 
 Willoughby
 
 v.
 
 Zylstra,
 
 5 Cal.App.2d 297 [42 P.2d 685]; see also
 
 Hope
 
 v.
 
 Arrowhead & Puritas Waters,Inc.,
 
 174 Cal.App.2d 222 [344 P.2d 428].)
 

 Plaintiff does not question that this is the rule.
 

 The only purpose of the use of appellant’s statement was to show that Doctor Ballard was aware that Doctor Orr’s report recorded plaintiff’s statement as a part of the history the doctor obtained from him, and that Doctor Ballard took that fact into consideration in reaching his opinion that plaintiff had suffered from a salt deficiency syndrome and not a cerebral vascular accident in May 1962. The questioning of Doctor Ballard was legitimate cross-examination. Probing into the reasons of an expert witness for his opinions is usually the only recourse of the cross-examiner. It may be as important to learn what facts the witness disregarded as unimportant in the formation of his opinion, as to ascertain what facts he believed and relied upon as the foundation of his opinion. Doctor Ballard was familiar with Dr. Orr’s report and with the history of plaintiff which it contained, and having this
 
 *875
 
 information, in addition to what he had learned from Doctor Holder and his own examination and tests, he at first formed the opinion that plaintiff had suffered a cerebral vascular accident, or stroke, in May 1962. After he was shown a copy of Doctor Holder’s report he came to the opposite conclusion for the reason that it was shown in the report that a neurological test was negative and that plaintiff’s reflexes were physiological (normal). The record does not disclose that there was anything in the report, except these entries, which caused Doctor Ballard to reach the conclusion that plaintiff was suffering from a salt deficiency syndrome and not from a cerebral vascular accident. Doctor Ballard not only rejected the diagnosis of Doctor Holder, shown on his report, that plaintiff had suffered a “C.V.A.” (cerebral vascular accident), but he ignored, as unimportant, Doctor Holder’s testimony that plaintiff was under treatment for extreme hypertension.
 

 In view of the fact that the second opinion of Doctor Ballard was the direct opposite of the one he had first reached, it was especially important for counsel to conduct a cross-examination which would bring out that in reaching his first opinion the doctor probably relied to some extent upon plaintiff’s statement that he had suffered three strokes and that in reaching his second opinion the doctor completely ignored the statement. The fact that Doctor Ballard eventually did not believe plaintiff had suffered a stroke on May 7th did not render inadmissible evidence of plaintiff’s history recorded on the hospital record after it was shown that the doctor had read and considered the same in forming his opinions.
 

 The objection that the statement of plaintiff concerning the strokes was incompetent as the opinion of a layman upon a medical question is not sustainable. The jury was properly instructed that the statement was not to be considered as evidence that plaintiff had suffered strokes in 1962.
 

 It must be presumed that the jury heeded the admonition and did not consider the report as evidence that plaintiff had previously suffered strokes. However, in the present instance if the jury failed to do as directed by the court, no real harm would have been done. The jurors would have understood that plaintiff was only giving a common name to conditions which he described in his testimony and which were also fully described by Doctor Holder. Referring to those attacks as strokes did not add anything.
 

 The next claim of error requires no extended discussion. Relevant to the testimony given by Mr. Spaine, Doctor Holder
 
 *876
 
 was asked upon cross-examination whether his opinion as to the condition of plaintiff caused by the accident would be influenced if plaintiff had talked like he had a mouthful of mush. The doctor said he was not aware of that situation and that it would depend upon what the cause was. The question was objected to upon the ground that the doctor had testified
 
 “that
 
 such was not the fact in his experience as a treating doctor.” The court ruled the objection was well taken “during the period that this witness was the treating doctor. ’ ’ The doctor then testified he had no recollection that plaintiff talked as if he had a mouthful of mush. The subject was then dropped, apparently in the belief the court had ruled that the question need not be answered unless the doctor had noticed that condition in his examination of plaintiff. The question was not answered. However, it is unlikely that Doctor Holder would have answered the question in a manner contradictory of the opinion he had expressed, and he might have answered that if the assumed condition had existed he would have attributed it to progress of the pre-existing condition he had described. The failure of plaintiff to obtain an answer to the question could not possibly have resulted in actual prejudice to his case.
 

 We turn to the next assignment of error: in the direct examination of Doctor Bercel he was asked a hypothetical question which we abbreviate as follows: assuming that the treating doctor (Doctor Holder) testified that he noticed no dragging of the feet, or any slurring of speech or imbalance or nasal twang and the patient complained of none “would any slurring of the speech or dragging of the leg or sense of imbalance which occurred after the episode of January 19, 1963, be in any way connected to the accident of June 27th, 1962?” There was an objection that the witness was called upon to pass upon what went on in the mind of another person. The objection was overruled and the witness answered there was no connection. Asked why, he replied that if those things had occurred Doctor Holder would have noticed them. A motion to strike the answer was denied. The objection should have been sustained or the motion should have been granted. The doctor was impressed by the testimony of Doctor Holder, but he failed to answer the question. However, the confusion was dissipated in the recross-examination; the doctor was asked whether his opinion would be different if he assumed these things just mentioned had occurred and he answered that his opinion would not have been different. He also said he
 
 *877
 
 did not base bis opinion upon what was described to him by Doctor Holder nor upon his expectation of the activity of Doctor Holder in making notes. The incident resulted in no harm to plaintiff.
 

 We consider the next claim of error. On page two of Doctor Holder’s hospital report it was stated “42-year-old white male who suddenly became dizzy while cooking in restaurant, became progressively weak and was unable to stand or use left hand with usual ability. He was taken to emergency hospital where doctor observed blood pressure of 185 over 106 and apparent C.V.A. involvement of left eye, hand and leg. ’ ’
 

 In the direct examination of Doctor Bercel defense counsel read the above to the jury as the basis of an intended question. Before any question was asked there was an objection that the record, as read, had to do with the opinion of some other person and was hearsay. The objection was overruled. Doctor Bercel was asked: “Doctor, based upon that history and without making any clinical examination yourself, could you form an opinion as to what, if anything, was troubling the individual at that time, medically ? ’ ’ The doctor said he could and “That there was some blood vessel involvement in the brain, probably in the form of an arteriospasm. . . . it’s the least, the mildest form of C.V.A. ”
 

 The objection should have been sustained. Except for the wording “apparent C.V.A. involvement of left eye, hand and leg,” the report stated facts related to the patient’s history. The portion which purported to be an observation as to plaintiff’s condition was the random opinion of a hospital doctor and no part of the patient’s history. It was unrelated to the injuries which required emergency attention. It was inadmissible hearsay. The jury should not have been permitted to hear that part of the report. Doctor Bercel should not have been permitted to express a medical opinion based, in part, upon an observation made by another doctor who did not testify. The proper procedure would have been for counsel to inform the court, outside the hearing of the jury, that he proposed to read that part of the report and ask for a ruling; the objectionable part could have been eliminated.
 

 When a hypothetical question is asked and it contains a portion which is considered to be improper the objection should be addressed specifically to the objectionable portion, and a general objection is not sufficient.
 
 (Christensen
 
 v.
 
 Malkin,
 
 236 Cal.App.2d 114, 127 [45 Cal.Rptr. 836] ;
 
 Borkheim
 
 v.
 
 Borkheim,
 
 65 Cal.App. 218, 222 [223 P. 429].) We believe
 
 *878
 
 that plaintiff’s objection was sufficient to inform the court that it was directed only to that portion of the report which stated opinions of the emergency hospital physician.
 

 Defendants do not directly meet this claim of error. First they say it was answered by what they said in their brief respecting the use of Doctor Orr’s report in the cross-examination of Doctor Ballard. That was an entirely different situation. The statement attributed to appellant in Doctor Orr’s report was a part of appellant’s history given to Doctor Orr and it was properly used in the cross-examination of Doctor Ballard. The objectionable part of Doctor Holder’s report as contained in the hospital record was the reference to the conclusions of the hospital physician which were no part of plaintiff’s history.
 

 Next defendants assert that if there was error in the use of that report it was invited error. They say that the hospital report was first used by plaintiff when Doctor Ballard was asked to look at it and state whether he found anything on page three which influenced his opinion. The doctor said he was influenced by a statement that the neurological examination was negative and the reflexes were physiological, or normal. This limited use of the report by plaintiff, which was proper, did not give defendants the right to use the inadmissible part of the report.
 

 Although it was error to permit the jury to learn that the emergency hospital physician had diagnosed plaintiff’s condition as stated in the report, we do not find the error to have been prejudicial. The physician’s unsworn conclusion added nothing to the positive testimony that plaintiff suffered a slight stroke on May 7th.
 

 There is no other claim of error which is serious or deserving of particular discussion.
 

 The jury, in assessing damages, had only to weigh plaintiff’s expert evidence against that furnished by defendants’ experts, and we cannot believe that the jury’s conclusion that the weight of the evidence was with the latter was influenced in the slightest degree by any of the matters of which plaintiff complains. The testimony of Doctor Holder was consistent with his findings while he was treating plaintiff. He was better informed than the others as to plaintiff’s condition at all relevant times and he appeared by all tests to be competent, conscientious and impartial in his testimony. It was not denied that plaintiff was suffering from a condition which was likely to result in a major stroke. That was the crucial question and,
 
 *879
 
 in our opinion, the answer which is evidenced hy the verdict was clearly the most reasonable one the jury could have reached.
 

 The judgment is affirmed.
 

 Ford, P. J., and Cobey, J., concurred.
 

 A petition for a rehearing was denied December 12, 1967, and appellant’s petition for a hearing by the Supreme Court was denied January 11, 1968.
 

 *
 

 Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.