[Civ. No. 23780.    First Dist., Div. One.    Oct. 19, 1966.]

CLYDE SIMMONDS, Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; THE PEOPLE, Real Party in Interest.

Belli, Ashe, Gerry & Ellison, Melvin M. Belli and Lois Prentice for Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Garnucci and Paul N. Halvonik, Deputy Attorneys General, for Real Party in Interest.

SIMS, J.—On May 19, 1966 the grand jury of the City and County of San Francisco returned an indictment against Clyde Simmonds and four others charging them with violation of Penal Code sections 182 (conspiracy to commit murder) and 187 (murder) arising out of the death of Dow Wilson. Simmonds' motion to dismiss the indictment on the grounds that he had been indicted without reasonable or probable cause (Pen. Code, § 995) was denied, and he filed his petition with this court under the provisions of section 999a of the Penal Code. An alternative writ was issued to review the sufficiency of the evidence to sustain the indictment.

Petitioner contends that the evidence fails to establish the corpus delicti of a conspiracy involving him, and that therefore his admissions and declarations are not competent to establish the existence of a conspiracy or his participation in it; and that in any event the evidence adduced against him is insufficient to establish reasonable or probable cause that he participated in the offenses charged.

### The Corpus Delicti

The record reflects that at about 1 a.m. on April 5, 1966, following a union meeting, Dow Wilson, an official of the San Francisco Painters' Union, was brutally gunned down in the vicinity of 16th and Mission Streets; that following the

reports of four shots a car which had been observed parked at the curb containing two occupants, one of whom was subsequently identified as Max Ward, drove off at a high rate of speed.

Ward was a member of the Painters, Decorators, and Contractors Association of Sacramento, and as such was a contractors' representative on a joint committee (presumably a joint employer-employee negotiating committee) and one of the four acting, of five authorized contractor trustees on a joint union-management board of ten trustees controlling and managing the investments and expenditures from the fringe-benefit fund of the Sacramento Painters Union.

The record further reflects that in February 1966, prior to Wilson's murder, Norman Call and Carl Black made overtures to Wallace Charleston to secure his services to "dump" Wilson. Charleston backed down when he learned that a killing rather than a beating was involved, and used Call's revelations that five or more people were involved as a reason to withdraw.

Call was also a trustee of the fringe-benefit fund appointed by the contractors' association and a member and former business representative for the joint committee. Dissension developed over the disposition of the fringe-benefit fund, and in response to talk about audits Call brought Black in at the end of 1965, or beginning of 1966, to act as auditor of the fund.

In March or April of 1965 the Sacramento union had appointed Wilson to negotiate a new contract on their behalf. In this capacity he necessarily met and negotiated with Call and Ward, among others. Dissension developed and at one meeting Call refused to recognize him and the meeting broke up.

Call at the time of his arrest on May 11th stated that he thought Wilson was trying to take over the Sacramento union and all of Northern California for that matter; that Wilson had stated the people involved in the investments of the union funds were a bunch of "stupid asses"; and that the members of the union were talking about moving the fringe-benefit funds to San Francisco.

After Wilson's death, Charleston cooperated with the authorities in the investigation which led to the indictment of petitioner, Ward, Call, Black and one Rock, Black's brother-in-law. He met with Call under the surveillance of the police in Sacramento on May 4 and in San Francisco on May 6 and

May 9th. On May 9th Call told Charleston, "There's only three of us who knows who it is: the guy that give the order and me, that set it up, and the two that done it. Well, that's really four then, I mean, putting it that way."

It was on May 5th that a telephone call to a Sacramento telephone number, ostensibly to Call at other than his home telephone number, produced the conversation which it is contended implicated petitioner. Petitioner was the financial secretary or secretary-treasurer of the Painters, Decorators and Contractors Association of Sacramento, and it may be inferred that the call was to the office of that organization.

■ Petitioner properly asserts that the declarations of the alleged coconspirators which tend to show the existence of a conspiracy cannot be used against him until the conspiracy is established. (*People* v. *Garcia* (1962) 201 Cal.App.2d 589, 593 [20 Cal.Rptr. 242] ; *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 24 [345 P.2d 513] ; and see: *People* v. *Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17].) He further asserts that the remaining evidence fails to show a conspiracy involving him. He relies upon the following: "Although it has been said that 'Identity of the perpetrator is never a part of the corpus delicti' (Fricke, California Criminal Law (8th ed.) p. 23), no case of conspiracy has been found so holding. The gist of the crime of conspiracy is *a corrupt agreement between two or more persons* to commit an offense prohibited by statute accompanied by some overt act. (Pen. Code, §§ 182, 184; *People* v. *Sica,* 112 Cal.App.2d 574, 580, 581 [247 P.2d 72].) And in several California conspiracy appeals where the rule of corpus delicti has been discussed it was at least implicit in the decision that identification of the defendant as a party to the agreement, at least by description, is a part of proof of the corpus delicti. (*People* v. *Sica, supra,* p. 584; *People* v. *Steccone,* 36 Cal.2d 234, 239 [223 P.2d 17] ; *People* v. *Curtis,* 106 Cal.App.2d 321, 327 [235 P.2d 51] ; *People* v. *Catlin,* 169 Cal.App.2d 247, 253 [337 P.2d 113].)" (*People* v. *Cancimilla* (1961) 197 Cal.App.2d 242, 249 [17 Cal.Rptr. 498].)

The prosecution rely upon the general principle, recognized in the foregoing extract, that the identity of the offender is not part of the corpus delicti. (*People* v. *Van Wagoner* (1961) 196 Cal.App.2d 126, 128 [16 Cal.Rptr. 342] ; *People* v. *Koomer* (1961) 188 Cal.App.2d 676, 679 [10 Cal.Rptr. 607].) It further relies on the law's recognition that it is rarely possible to prove an express agreement among coconspirators, and that the existence of the conspiracy may be proved by circum-

stantial evidence. (*People* v. *Steccone, supra,* 36 Cal.2d 234, 237-238; *People* v. *Garcia, supra,* 201 Cal.App.2d 589, 592; *People* v. *Sica* (1952) 112 Cal.App.2d 574, 581 [247 P.2d 72].)

The cases cited in *Cancimilla* do not elucidate what is meant by the identification of the defendant "at least by description." ██ Where, as here, a conspiracy is established, recourse should be had to the evidence establishing the conspiracy to determine its possible scope. It would be unreasonable to say that the mere establishment that two persons were acting in concert justified bringing in anyone who might be acquainted with either of the participants. In fact the law recognizes that mere association or mere presence cannot alone furnish the basis for a charge of coconspiracy. ██ (*Lavine* v. *Superior Court* (1965) 238 Cal.App.2d 540, 543 [48 Cal.Rptr. 8]; *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, 23; *People* v. *Mata* (1955) 133 Cal.App.2d 18, 22 [283 P.2d 372].) On the other hand, where two or more persons have effectually conspired to eliminate a person who has been interfering in their business, and the circumstances do not themselves limit the number involved in the conspiracy but rather suggest that more persons are involved, it would be equally untenable to rule that others with leadership in the same business were not within a class contemplated by the conspiracy established by the evidence.

It is concluded that the evidence establishes a corpus delicti of a conspiracy broad enough to include petitioner as a fellow official with Call and Ward in the painting contractors' association.

### The Evidence of Implication

██ The sole evidence to connect petitioner with the offenses charged, other than that relating to his official capacity, is that contained in the recording of his conversation with Charleston.

The transcript of this conversation reflects that petitioner answered the telephone with a salutation and the informer asked for Call. In response to his inquiry Charleston was furnished with Call's home telephone number which Charleston acknowledged he knew. After an exchange concerning the difficulties of reaching Call, petitioner was asked to identify himself and did so; and Charleston disclosed that he was Wally and asked Simmonds to give Call a message: "Wally from San Francisco wants to get in touch with Norman Call." After repeating this back, petitioner started laughing,

and on Charleston's inquiry replied, that "some peculiar things had happened but I'm not talking about them."[1]

Petitioner then acknowledged that he thought Charleston had called several months ago and that he had passed the call on;[2] and volunteered, "We uh—lost a good man in San Francisco, didn't we?" The conversation continued as follows: "Mr. Charleston: I imagine you did. I don't know anything about it. Mr. Simmonds: You don't. Mr. Charleston: What's, what— Mr. Simmonds: I don't know anything about it except what I read. Mr. Charleston: Oh, yeah. Mr. Simmonds: (Laughter) I had a fellow call me up and to ask me, 'Where was you at midnight last night?' Mr. Charleston: Oh, Christ. Mr. Simmonds: I says, 'Well, I was in bed.' Can you prove it? (laughter) Mr. Charleston: Yeah, oh, sometimes those things are pretty hard to prove. Christ, I can't remember where I am, you know, half the time. Mr. Simmonds: (Laughter) Oh, that's why I say, the less said the better sometimes. Mr. Charleston: Yeah, that's true. Jesus Christ. Of course, you got a—I don't know, you've got so much going on up there with all that bull shit, you know. Like a bunch of old ladies. Mr. Simmonds: Well, we—we do what we have to do, you know. Mr. Charleston: Yeah, I imagine so. You know, just some of those things. Mr. Simmonds: I had to take a certain little action to stop a fire from going into a big bonfire, and now you don't hear any more about it. (Laughter) Mr. Charleston: Yeah, that's right."

The conversation then reverted to getting a message to Call and was brought to a close.

---

[1]The transcript reads: "Mr. Charleston: What are you laughing at? Mr. Simmonds: Well, we've had some peculiar things happen, but I'm not — Mr. Charleston: What's that? Mr. Simmonds: — talking about them. Mr. Charleston: What's that? Mr. Simmonds: Huh? Mr. Charleston: What's that? Mr. Simmonds: Oh I — I'm not going to talk about 'em. ha ha. Mr. Charleston: What do you mean peculiar things? Mr. Simmonds: Well, I'm not talking about 'em. Mr. Charleston: What'd he do, empty the safe? Mr. Simmonds: Huh? Mr. Charleston: What'd he do, empty the safe? ha ha. Mr. Simmonds: Huh? Mr. Charleston: Did he empty the safe? Mr. Simmonds: No, it's not got nothing to do with no safe. I, I say some peculiar things happened and I'm not talking about 'em. Mr. Charleston: Oh. Mr. Simmonds: If I'd talk to you, I'd talk to somebody else. I've got confidence of a lot of people, and I — I've got a right to be amused. Mr. Charleston: Well, I've got — I imagine you have."

[2]This colloquy reads: "Mr. Simmonds: Yeah (laughter). I think you called — or I had a call from you sometime several months ago. Mr. Charleston: Yeah, that's possible. Mr. Simmonds: I passed it along. Mr. Charleston: Yeah, that's possible. Mr. Simmonds: That's all I did. (laughter) Mr. Charleston: Yeah, you might have."

Petitioner asserts: "From the tape recording the grand jury could have easily determined CLYDE SIMMONDS to be a hard-of-hearing, ill, old man, who, like many old men declining in virility and physical strength, find new strength and self-importance in their boastful speech. The foregoing conversation represents this personality characteristic and no more."

On the other hand, the statements are equally open to the inference that petitioner had knowledge that a "good man" was lost in San Francisco, and that petitioner having taken "a certain little action" there was no more smoke or fire about the manner in which the contractor's representatives ran the fringe-benefit fund.

At the request of petitioner and the real party in interest the court, en bank, listened to a rendition of the tape recording which had been played to the grand jury. The auditory impressions reflect that the grand jury may well have considered the "(Laughter)", which is so blandly reported in the typed record, as Mephistophelian rather than Falstaffian.

The evidence reveals "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Nagle* (1944) 25 Cal.2d 216, 222 [153 P.2d 344]; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55-57 [216 P.2d 859]; and see *Davis* v. *Superior Court, supra,* 175 Cal.App.2d 8, 22-23.)

The alternative writ is discharged, and the petition for the peremptory writ of prohibition is denied.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied November 4, 1966.